CLEVELAND CHAIR COMPANY and
William R. Jackson

v.

The UNITED STATES.

No. 155–76.

United States Court of Claims.

June 15, 1977.

Harold A. Schwartz, Jr., Chattanooga, Tenn., for plaintiffs. Richard P. Jahn, Chattanooga, Tenn., attorney of record. Tanner & Jahn, Chattanooga, Tenn., of counsel.

John W. Showalter, Washington, D.C., with whom was Asst. Atty. Gen. Barbara A. Babcock, Washington, D.C., for defendant.

Before NICHOLS, KASHIWA, and BENNETT, Judges.

ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge.

This contract case, before the court on the parties' cross-motions for summary judgment, arose out of a tax dispute litigated in the Tax Court in the mid-1960's, over alleged tax deficiencies said to be owing from the early 1940's. After obtaining an adverse decision from the Tax Court in 1964, *Jackson v. Commissioner*, 23 T.C.M. (CCH) 2022, plaintiffs decided to appeal the ruling to the United States Court of Appeals for the Sixth Circuit. In order to do so, and yet stay assessment and collection of the tax deficiency determined by the Tax Court, it was necessary for plaintiffs to post an appeal bond with the clerk of that court. *See* 26 U.S.C. § 7485 (1970). This they did by supplying the clerk with United States Treasury bills worth approximately $1 million, as permitted by 6 U.S.C. § 15 (1970). The bills, issued on October 21, 1965, having 6-month maturities, were delivered to the clerk several days after their issue date.

The bills matured on April 21, 1966, while on deposit in the Treasury, where the clerk had placed them pursuant to 31 C.F.R. part 225 (1966). There they sat, accruing no further interest, until plaintiffs moved the Tax Court on May 2, 1967, to allow substitute collateral (new Treasury bills with later maturity dates) to secure their tax obligation. As provided in 6 U.S.C. § 15 (1970), which gave plaintiffs the right to ask for the collateral substitution upon offering equally acceptable security to the Government, the Tax Court allowed the request on May 3, 1967. Plaintiffs then removed the matured bills from the Treasury and presented them for payment. However, the fact remained that the bills sat in the Treasury interest-free from April 21, 1966, to May 3, 1967.

Plaintiffs eventually lost their tax case in the Sixth Circuit, *Jackson v. Commissioner*, 380 F.2d 661 (1967), certiorari was denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967), and they paid the assessed deficiency in 1968. Thereafter they filed a claim for a tax refund contending that the Treasury should have reinvested the matured bills, or notified them of the bills' maturity, or failing the foregoing, at least given them the equivalent of the interest that would have accrued on nonmatured bills from April

1966 to May 1967, which they calculated at 6 percent per annum to be $61,662.12. This interest, plaintiffs said, should have been applied in partial payment of their then outstanding tax deficiency, and since it was not, they in effect overpaid their taxes when they remitted the full amount of the assessed deficiency. The Commissioner disallowed the claim. Plaintiffs then sued in the United States District Court for the Eastern District of Tennessee, claiming (1) overpayment of taxes, (2) tortious injury by the negligent failure to reinvest, (3) unjust enrichment, and (4) breach of an implied security agreement or fiduciary duty to reinvest or give notice that the bills had matured.

In an unreported memorandum opinion, the district court dismissed the first two claims. *Cleveland Chair Co. v. United States*, Civ. No. 6870 (filed Nov. 19, 1974). It viewed the tax refund claim as inapt because no more than the deficiency was actually paid and because the contention that interest should have been paid was only a contract or fiduciary breach claim that arose incident to tax litigation. Further, it held the claim of injury under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.* (1970), not cognizable because both out of time and covered by an exclusion in the Act for damages arising out of Treasury fiscal operations. Finally, it transferred the unjust enrichment and the breach claims to this court, pursuant to 28 U.S.C. § 1406(c) (1970), because they exceeded $10,000. *See* 28 U.S.C. § 1346(a)(2) (1970). The Sixth Circuit affirmed, 526 F.2d 497 (1975), and thus the case is here, on a stipulation of facts reached in pretrial proceedings in the district court. Since no material fact is in dispute, we proceed to resolve the matter on the parties' cross-motions.

■ The issue is whether defendant is liable in damages for failure to reinvest plaintiffs' Treasury bills after they matured, or alternatively, to notify plaintiffs of their maturity, such duty of reinvestment or notice being grounded in a security agreement between the parties implied from the facts. Plaintiffs and defendant essentially quarrel over two points: whether they had an "agreement" necessary to form an implied contract in the nature of a "security agreement" within the meaning of article 9 of the Uniform Commercial Code (UCC), and whether defendant breached any duty thereunder if such a contract existed. Plaintiffs do not claim that a judgment in their favor can be based on any theory other than implied contract. Their assertion that defendant's "unjust enrichment," by being the obligor on the Treasury bills and thus having the benefit of plaintiffs' funds without paying interest thereon, gives rise to a claim cognizable in this court can only be read as suggesting that this potential enrichment (viewed from the time the bills were deposited in the Treasury) is just one other reason why the Government implicitly agreed to hold the bills as a "security interest." Unjust enrichment cannot in itself be the basis for a recovery here, for it lacks the consensual element needed to find a contract implied in fact, and only provides support for the remedial device known as a contract implied in law, over which this court has no jurisdiction. *Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 192 Ct.Cl. 649 (1970). Likewise, plaintiffs' claim for damages arising out of defendant's breach of a fiduciary duty must be grounded in a contractually based obligation to plaintiffs to succeed here.

■ Both parties agree that, under *Groves v. United States*, 202 Ct.Cl. 660 (1973), UCC article 9 (Secured Transactions) should be applied to determine whether a security agreement arose between them, and if so, what the security holder's obligations were. Paragraphs (3) and (37), section 1–201, of the Uniform Commercial Code, provide respectively that an "agreement" within the meaning of article 9 may be implied from the circumstances surrounding a transaction, and that a "security interest" within the article is any interest in personalty which an owner transfers to a creditor in order to secure the payment of an obligation. Thus, for article 9 purposes,

there may be a common-law implied agreement. Further, the substance of a "security interest" within the meaning of the article exists in this case, for an interest in personalty (the Treasury bills, along with a power of attorney in the name of the Government to sell the bills in the event of a default of plaintiffs' tax obligation) was given to a creditor (the Tax Court clerk, acting for the Government) by the owner (plaintiffs) to secure payment of an obligation (the tax deficiency).

For plaintiffs to prevail, they must establish both that a security agreement implicitly existed in fact between themselves and the Government, and that the Government breached some duty owed them under that agreement. An agreement to create a security interest in the Treasury bills is necessary to bring this case within article 9 according to UCC § 9–204(1) and *Groves v. United States, supra,* and yet determining whether a consensual agreement can properly be implied from the conduct of parties is always a difficult and delicate exercise. *See Primary Metal & Mineral Corp. v. United States,* 556 F.2d 507, Ct.Cl. (decided May 18, 1977); *Grismac Corp. v. United States,* 556 F.2d 494, Ct.Cl. (decided May 18, 1977); *Collins v. United States,* 532 F.2d 1344, 209 Ct.Cl. 413 (1976); *Cutler-Hammer, Inc. v. United States,* 441 F.2d 1179, 194 Ct.Cl. 788 (1971). We do not think we need to address the existence of such an agreement for, even assuming that it existed, we are not persuaded that the Government has breached any duty owing to plaintiffs thereunder. We therefore decline to rule on the propriety of implying an agreement from the facts, and turn to a discussion of the alleged breach of obligation on the assumption that an article 9 security agreement was present.

Plaintiffs claim that defendant had the duty, upon the maturity of the bills, either to reinvest them or to notify plaintiffs that they had matured. Further, since neither reinvestment nor notification was undertaken by defendant's agents, it is said that the parties' security agreement was breach-ed, requiring defendant to respond in damages under UCC § 9–207(3). Plaintiffs, however, in support of their assertion that a duty to reinvest or to give notice did indeed exist, can point only to statements in § 9–207(1) and (2)(c) requiring a security holder to "use reasonable care in the custody and preservation of collateral" in its possession, and to deliver up to the owner or apply to his secured debt any income that the holder receives on the principal. They cite no case where it has been held that a duty to "preserve" principal includes an obligation to make the principal sum produce income. At oral argument, for example, plaintiffs stressed the importance of *Grace v. Sterling, Grace & Co.,* 30 A.D.2d 61, 289 N.Y. S.2d 632 (1968), to the resolution of this case, contending that that decision supported their theory here. But *Grace* involved only an obligation to preserve the value of the pledged securities, certain convertible debentures, from impending diminution, and not to nurture their appreciation. The New York court observed:

> * * * [The security holder's] responsibilities extend to the exercise of such care as a reasonably prudent pledgee would exercise under like circumstances to *protect and preserve* the validity and value of the securities. * * *.
>
> * * * * * *
>
> The value of the Gardner-Denver debentures, owned by the plaintiff and held by [defendant] Cleveland [Trust Company] as pledgee, depended to a great extent upon their convertibility feature. * * *.
>
> * * * * * *
>
> As a reasonably prudent bank keeping informed with respect to collateral held by it, Cleveland would know that, following a duly published redemption date, the Gardner-Denver debentures would *drastically depreciate* in value. * * *. Prudent banking or investment practices would suggest that, prior to redemption, the debentures be sold or converted to protect the value of the investment. * * *. [289 N.Y.S.2d at 637–38, 640–41.] [Emphasis supplied.]

A security holder who does not present the security for payment or give notice that payment is due on it at the time it matures and becomes collectible may well be liable for failure to prevent loss through the insolvency of the obligor, or for failure to prevent release of parties contingently liable on the security. *See* annotation at 45 A.L. R.3d 239, 272–75 (1970). Such liability arises upon failure to act when the security matures, however, precisely because the timing in presentment of the security or of notice of payment due on it is critical to the preservation of the security's value. Delay means that an obligor solvent upon maturity is not bothered with the need to make the payment due until he becomes insolvent. Delay means that contingently liable parties, who could be held responsible for the defaulting obligor's indebtedness, are permitted to be discharged. Such is not the case here. Diminution in the value of the Treasury bills did not occur at all, let alone by virtue of the Government's nonaction in April 1966. No diminution in the bills' value was even remotely possible. Upon presentment of the bills by plaintiffs, albeit over a year after maturity, the Treasury paid out their full value on the maturity date.

The cases on the security holder's obligation to preserve the value of the principal invariably stop short of requiring that action be taken, when the security matures, to insure that it will continue to produce income. Defendant points out that UCC § 1–102(3) authorizes the parties to an agreement within the UCC, including an article 9 security agreement, to specify their respective rights and duties, even to the extent of varying the rules of the UCC. Defendant also notes that the only written terms of the parties' security agreement to be found anywhere—still assuming *arguendo* that there was an agreement—exist in the provisions of 6 U.S.C. § 15 and 31 C.F.R. part 225, dealing with the Government's acceptance of its own fiscal obligations as security for indebtedness. The statute and regulation generally limit their discussion of the Government's duties to acceptance of the security, permission of substitution of collateral, and delivery of the security intact upon satisfaction of the secured obligation. From all this defendant argues that the specification of the duties just mentioned, and the absence of specification of any duty to reinvest or give notice of a security that had matured, must lead to the conclusion that the parties expressly agreed in this case not to obligate the Government to see that the bills on deposit continue to bear interest. We find this argument appealing, for while the statute and regulation may not relieve the Government from the broad duty to exercise reasonable care and perhaps do not list all the actions that the Government is obligated to undertake as a security holder by the ordinary dictates of prudence, certainly where a wholly new duty is sought to be imposed upon the holder, a duty not recognized in any of the decided cases, there is good reason to conclude that its conspicuous absence from among the written terms of the security agreement means that the parties did not contemplate its existence in the first place. Where the terms of a security agreement cover a great many aspects of the security holder's duties but omit from mention any duty of the holder, not supported in the case law, to take care that a pledged security always continues to produce income, such a duty will not be implied.

We have been informed of no reason why the well-acknowledged obligation of a security holder to act prudently to preserve the principal sum of the pledged security should now be extended to include a duty to promote its increase by keeping it on interest. Rather, we can think of at least two reasons, in this case at least, for refusing such an extension. First, it would create a considerable burden upon the Treasury to manage debtors' portfolios, notifying them of maturing bills or changing the investments when the bills matured, which would probably require a great mass of activity in the Treasury on practically every working day. No pledgee, including the Government, is required to play the role of investment counselor or mutual fund. Further, if the Government were to undertake rein-

vestment of matured bills, disputes would be likely to arise on the sufficiency of return on the new investment, *see Cheyenne-Arapaho Tribes v. United States*, 512 F.2d 1390, 206 Ct.Cl. 340 (1975), disputes that can be avoided by absolving the Government of a duty to reinvest and simply allowing the security owner to make the reinvestment decision, which the owner is always free to do under the broadly permissive rules on substitution of collateral found in 6 U.S.C. § 15. Secondly, plaintiffs here, having themselves purchased the bills they transferred to the Tax Court clerk, knew very well what the maturity dates of their bills were. They bought the bills knowing their duration, they received from the clerk a receipt with the maturity dates stated on it, and they always enjoyed the right to substitute other collateral for them, as mentioned, so long as the substitute was sufficiently valuable. Indeed, plaintiffs did make such a substitution, although belatedly, obtaining in May 1967 the Tax Court's apparently pro forma approval of the substitution of new Treasury bills with April 1968 maturities. It seems that plaintiffs made a mistake, and now wish the Government to pay for it. We therefore decline to hold that the Government was at fault in allowing plaintiffs' bills to sit on deposit with the Treasury interest-free, without reinvestment or notice to plaintiffs.

Plaintiffs' petition also asks for interest on the sum alleged to have been wrongfully deprived them by defendant's supposed breach of the security agreement. Even if plaintiffs were correct about the breach, which we have just concluded they are not, still they would not be entitled to the interest claimed for delay in payment. Interest is not recoverable from the sovereign on damages awarded for breach of contract or of a fiduciary duty. *United States v. Thayer-West Point Hotel Co.*, 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 (1947); *United States v. Mescalero Apache Tribe*, 518 F.2d 1309, 207 Ct.Cl. 369 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976).

For the foregoing reasons, we conclude that plaintiffs' claim is without merit. Therefore, plaintiffs' motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.