PITTSTON WAREHOUSE
CORPORATION,
Plaintiff,

v.

AMERICAN MOTORISTS INSURANCE
COMPANY and C.A. Shea &
Company, Inc., Defendants.

No. 88 Civ. 6238 (RWS).

United States District Court,
S.D. New York.

June 13, 1989.

Sandler & Travis, P.A., New York City (Edward M. Joffe, of counsel), for plaintiff.

Russotti & Barrison, New York City (Harvey Barrison, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Plaintiff Pittston Warehouse Corporation ("Pittston") has moved pursuant to Fed.R. Civ.P. 37 to compel discovery. Defendants American Motorist Insurance Company ("Amico") and C.A. Shea & Company, Inc. ("Shea") have moved for summary judgment pursuant to Fed.R.Civ.P. 56 and for a protective order. For the reasons set forth below, defendants' motion for summary judgment is granted in part and denied in part, their motion for a protective order is denied, and summary judgment is granted in part on behalf of Pittston.

### The Parties

Pittston is a New York corporation with its principal office in Newark, New Jersey. It is engaged in the operation of bonded warehouse facilities in compliance with 19 U.S.C. § 1555. A customs bonded warehouse is a building or other secured area in which dutiable goods are stored without payment of a duty.

Amico is an Illinois corporation, licensed by the State of New York to engage in the insurance business in New York, including acting as a surety on any contract of suretyship.

Shea is a New York corporation with its principal offices in New York. It is an insurance broker which represented Amico in its dealings with Pittston.

### Prior Proceedings

Pittston filed the complaint in this action on September 28, 1988. On January 11, 1989, Pittston brought the current motion to compel discovery. On January 18, 1989 defendants brought a summary judgment motion to dismiss the complaint, and for an order staying discovery pending the decision of the summary judgment motion. On that same date Pittston sought a stay of Amico's summary judgment motion pending discovery. The motions were considered on affidavits, argued and fully submitted on February 10, 1989. The facts set forth below are uncontested except as noted.

### The Facts

In 1979 the parties began a business relationship in which Amico acted as surety on Pittston's proprietor warehouse bond. Pittston, as a bonded warehouse proprietor, was required to post a surety bond with the United States Customs Service ("Customs") each time it uses a warehouse in compliance with 19 U.S.C. § 1555. Amico began to require collateral for the bonds executed on Pittston's behalf in November of 1981 when Pittston filed for bankruptcy.

On December 1, 1982, Pittston and Amico entered into a suretyship agreement under which a bond bound the principal and surety to the United States in the amount of $50,000.00 and was duly filed with Cus-

toms ("Bond I"). Bond I allowed Pittston to operate a bonded warehouse in New Jersey.

Shea, on behalf of Amico, required a $50,000.00 security for the bond and requested a letter of credit instead of cash, noting that a cash deposit would not generate any interest. Pittston provided the collateral in the form of a cash deposit of $50,000.00, and Amico executed the bond on Pittston's behalf. According to Pittston no agreement was made at that time concerning the rights and obligations of the parties to that security. Amico and Shea agree that no written agreement was made, but allege in affidavits that an implicit agreement existed that Amico would not pay any interest on the collateral.

On August 30, 1985, Customs requested a new form of bond from Pittston to replace any existing bonds previously filed certifying that the warehouse was a Class I—General Order Warehouse. On October 3, 1985, Amico issued a new Customs bond with Pittston as principal on behalf of the United States for $50,000.00 ("Bond II"). Amico requested an additional security of $50,000 because they felt termination of Bond I according to federal regulations would not extinguish its potential liability for acts performed while that bond was in force, a period of three years.

With Bond II, Pittston signed an indemnity agreement which stated that Amico as surety of that bond "or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is the United States," would hold the security until Pittston furnished Amico with "competent written evidence, satisfactory to [Amico] of the termination of any bond as to future liability." That agreement also "waives any right, if any, to interest which may be earned on collateral security."

On December 12, 1985 Customs decided the $50,000 amount of Bond II was insufficient and demanded issuance of a new bond of $100,000 within ten days ("Bond III"). Accordingly, Amico as surety for Pittston issued Bond III on January 13, 1986 and provided a Letter of Credit on April 11, 1986. The terms of the Letter authorized Amico to draw on Pittston with proof that they "have incurred liability or that a situation exists under which, in the sole judgment of the surety, claim may be made for loss ... and that such monies are required for the protection of the surety." The Letter of Credit was to be automatically extended for one year periods unless thirty days before the expiration date Pittston notified Amico that they have chosen not to renew the Letter. If Pittston did not renew the Letter of Credit, Amico had the right to draw on Pittston for the full amount of the letter with written certification that they have not been released from liability and that the funds will be used to satisfy any claims under the bond. Pittston reserved the right to demand repayment of any such funds not used in satisfaction of or reimbursement of any loss, cost, claim or expense which Amico incurs.

Also on April 11, 1986 Amico terminated Bonds I and II. Customs subsequently approved this termination effective January 31, 1986.

Pittston then requested return of the $100,000 security deposit initially posted for Bonds I and II, on April 21, 1986. Amico and Shea declined explaining that there was a possibility of continued liability relating to the period the bond was in effect prior to termination. On May 6, 1986, Pittston again requested release of its collateral. Defendants again refused.

Pittston met with Customs on March 17, 1987 requesting a statement from Customs that Bonds I and II were cancelled and that Customs would not seek recourse against Amico under these Bonds but instead would pursue remedies against the current bond, Bond III. Customs responded by letter on April 28, 1987 stating "that although Customs may pursue remedies against old bonds, for breaches committed during the effective period of those bonds ... [until the statute of limitations has run] ... the time of the breach of the bond for warehouse violations is generally presumed to be the time of discovery of the irregularities which give rise to the claim for liquidated damages." Despite this statement

of a general presumption, the letter went on to state that although it is unlikely that claims would be brought against Pittston under these bonds, Amico could be held liable for six years from the date of any breach which occurred during the period of the old bonds. Pittston forwarded to the defendants the correspondence from Customs on May 9, 1987 and on the basis of this letter again demanded release of the collateral for bonds. On May 11, 1987, also on the basis of that letter, Amico denied Pittston's request.

On June 18, 1987 Customs wrote Pittston stating that their Newark area warehouse inspection team had researched its files and those maintained by the Fines and Penalty staff and found that "no penalty actions are being contemplated or currently outstanding."

In August 1987, Pittston obtained a new surety bond with another company for $200,000 and requested the cancellation of Bond III with Amico as surety because of the filing of that bond. Bond III was terminated on August 13, 1987. Customs then wrote Pittston on September 21, 1987, acknowledging that Amico's bonds had been discontinued and replaced by a new customs bond. The letter further noted: "effective August 12, 1987, any liquidated damage or penalty claims assessed against Pittston Warehouse Corporation will be issued using this new Bond."

In January, 1988, Amico returned the $100,000 collateral, attributable to Bonds I and II but upon examination of Pittston's Balance Sheet, Amico determined the company was not sufficiently financially stable to release the entire collateral and retained the $100,000 Letter of Credit as security until Bond III was cancelled or otherwise released. According to Amico Pittston's attorney recommended retention of the Letter until such time as they "are cancelled or ... are otherwise released from [their] obligations under those bonds." Amico indicated they would not release the collateral until Pittston provided them with a general release from Customs. Pittston thereupon commenced this lawsuit.

*The Pleadings*

Pittston's complaint alleges three claims. The first is for conversion of their property. The second is for failure to preserve the value of the collateral, specifically, interest on the collateral for Bond II from the date of cancellation until the date the money was returned, as well as interest on the Bond I collateral from the date of payment until the date the funds were returned. The third is for defendants' breach of good faith in their dealings with Pittston.

*Standard for Summary Judgment*

Summary judgment is authorized if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *See id.* at 247–48, 106 S.Ct. at 2509–10; *Corselli v. Coughlin,* 842 F.2d 23 (2d Cir.1988). All doubts are resolved against the moving party, and all favorable inferences are drawn in favor of the party against whom summary judgment is sought. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir. 1985), *cert. denied,* —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1988); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (1983). Where a question of good faith is involved, summary judgment should be granted where the facts do not demonstrate any evidence of such bad faith. *Cf. Sam Wong and Son, Inc. v. New York Mercantile Exchange,* 735 F.2d 653 (2d Cir.1984). The Supreme Court recently has made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

*Sua Sponte Summary Judgment*

■ Where there has been a summary judgment motion but no cross-motion, the court already is engaged in determining whether a genuine issue of material fact exists, and the parties have had a chance to present evidence in support of or in opposition to the motion. Wright & Miller, *Fed. Practice and Procedure*, § 2720, p. 29. Summary judgment may be rendered in favor of the nonmoving party even though no formal cross-motion has been made under Rule 56. *Lowenschuss v. Kane*, 520 F.2d 255 (2d Cir.1975); *Procter & Gamble Independent Union of Port Ivory, New York v. Procter & Gamble Mfg. Co.*, 312 F.2d 181 (2d Cir.1962), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963). However, care must be used to ensure that the moving party had an adequate opportunity to establish a genuine issue of fact and that the opponent is not entitled to judgment as a matter of law. *Memphis Trust Co. v. Board of Governors of the Fed. Reserve Sys.*, 584 F.2d 921, 924 (6th Cir.1978); *McKenna v. Peekskill Housing Authority*, 497 F.Supp. 1217 (S.D.N.Y.1980).

Amico in moving for summary judgment has identified the facts as largely undisputed, and there is no indication that Amico was at all prejudiced in arguing this motion. *See Morrissey v. Curran*, 423 F.2d 393, 399 (2d Cir.1970), *cert. denied*, 399 U.S. 928, 90 S.Ct. 2245, 26 L.Ed.2d 796. Further, Amico will have an adequate opportunity to "adduce factual material which raises a substantial question of the veracity or completeness" of Pittston's case. *Beal v. Lindsay*, 468 F.2d 287, 291 (2d Cir.1972).

*The Conversion Claim*

Pittston's first claim of conversion cannot be dismissed because Pittston has proved both elements of the conversion claim by showing that Amico cannot be held liable under Bonds I, II or III. The defendant's summary judgment motion is therefore denied, and summary judgment is granted in favor of plaintiff as to the conversion claim.

■ To establish a conversion claim under New York law, a plaintiff must show legal ownership of, or a superior possessory right in the disputed property, and that, to the exclusion of the plaintiff's rights, the defendant exercised exclusive dominion and control over that property. *Middle East Banking v. State Street Bank Int'l.*, 821 F.2d 897, 906 (2d Cir.1987). For the purposes of the conversion claim the issue of good faith need not be reached. Conversion does not require the defendant's wrongful intent, but merely an intent to exercise such dominion and control in a manner inconsistent with the plaintiff's rights. *United States v. Morrison*, 536 F.2d 286, 289 (9th Cir.1976). Nor must the defendant apply the property to his own use. *Stickles v. Bernier*, 139 Misc. 405, 249 N.Y.S. 430 (1931). A rightful owner need only be deprived of his property, partially or temporarily. *Pierpoint v. Farnum*, 234 A.D. 205, 254 N.Y.S. 758 (1931), *aff'd* 260 N.Y. 26, 182 N.E. 235.

*Possessory Interest*

Under the indemnity agreement for Bond I, Amico has the right to retain the collateral until they are guaranteed to their satisfaction that there is no possibility of liability under this bond. Amico asserts that until they receive this assurance, Pittston has limited rights to the collateral under the terms of the indemnity agreement.

■ The indemnity agreement is enforceable because it contains valid terms. Under both New York law and statutory law, a satisfaction clause is not fatal to a contract as long as the party requesting satisfaction acts in good faith. Thus Pittston is obligated to meet Amico's demands as long as Amico exercises such demands in good faith. *See In Re Associated Teachers of Huntington, Inc. v. Board of Education*, 33 N.Y.2d 229, 306 N.E.2d 791, 351 N.Y.S.2d 670 (1973).

■ Pittston has presented sufficient evidence to refute Amico's claim of liability under Bonds I, II or III by virtue of the

September 21, 1987 letter from Customs. This letter frees Amico from liability under any claims "assessed" against Pittston on or after August 12, 1987. The term "assess" means to ascertain or "to fix the amount of the damages or the value of the thing to be ascertained." *Black's Law Dictionary* 106 (5th ed. 1979). The use of the term "discontinued" in lieu of "cancelled" in the letter does not undermine Custom's intent to end Amico's liability under Bonds I, II or III.

The September letter relieved Amico of any liability for claims under the bonds that are determined on or after the effective date thus clarifying the ambiguity which resulted from its April 28, 1987 letter. Nor does Amico have potential liability for claims prior to the June 18, 1987 letter from Customs which states that no claims were pending as of that date.

Amico urges that it could still be held liable for any claims assessed during the period between June 18, 1987 and August 12, 1987. However, if any such claims had been assessed against Amico, Amico would have been notified before this action commenced and would have such knowledge within their control. No evidence of any such claims has been presented. Pittston has established its superior and possessory right to the collateral and thereby has met the first element of the conversion claim.

*Exclusive Dominion and Control*

Pittston has established Amico's exercise of exclusive dominion and control over Pittston's rights in the collateral. Although according to Amico Pittston could still assert those rights it retained under the terms of the Letter of Credit. Those rights include the right to recover funds which Amico has drawn on the letter and not applied to the reimbursement of a liability as well as Pittston's right not to renew the Letter of Credit and to recover those expenses not used in satisfaction of any claim. Amico argues that they have not precluded Pittston's rights because these are the extent of Pittston's rights in the collateral.

However, Amico's retention of the collateral is at least a temporary deprivation of Pittston's right to their property. Pittston has proven its right to immediate access to the Letter of Credit because Amico is no longer liable under Bonds I, II or II. Even under the rights which Pittston retained under the terms of the indemnity agreement, it cannot obtain the collateral immediately because they cannot cancel or fail to renew the Letter of Credit until they are within thirty days of the expiration of the Letter of Credit. Therefore Pittston has proven a partial deprivation and the elements of a conversion. Summary judgment must be granted in favor of Pittston on the conversion claim.

*Date of the Conversion*

It is Pittston's position that Amico's conversion of the collateral under Bonds I and II occurred as of the termination of those bonds because it was unlikely that a claim would have been brought against Pittston under those bonds.

However, Pittston cannot establish Amico's lack of liability merely by showing that there was no likelihood of a claim; instead they must show that there is no future liability. Amico has established that there still could have been liability under Bonds I and II, even after Customs' April 28, 1987 letter acknowledging the termination of Bonds I and II and therefore demonstrates that a conversion could not have occurred before they received Customs' September 21, 1987 letter.[1] There is therefore no ma-

---

1. Amico submits proof of a claim that was filed by Customs as evidence of the potential liability Amico faces. In May, 1986, Shea received a demand for payment of $1,000 for a violation of Customs Regulations. The demand referred to a violation which apparently occurred on August 18, 1985 and was discovered on September 3, 1985, the date of the claim, one month after Bond II was issued. The claim was made against Bond I, a 1982 bond. At that time however, Bond I had not yet been terminated or cancelled. Bond I was terminated in January of 1986 and Bond III was issued in January 1986. Shea was subsequently notified of the claim in May, 1986. The date of notification is irrelevant to an issue of Amico's potential liability under any of these bonds. While this evidence shows the possibility of a claim for a breach discovered before the termination or cancellation of a bond, it does not alter the position taken by Customs in the September

terial issue of fact as to when the conversion occurred, namely, after Amico's receipt of the September letter.

Amico's potential liability rested on the theory that Customs may not, despite its "general" policy, presume the date of discovery of the claim is the date of the breach and that the termination of a bond does not end a surety's liability under that bond. The cancellation of a bond is the annulment of a bond, and its effect is to wipe out claims based on that bond condition. *See* 15 Cust.Bull. 806, C.S.D. 81–29 (1981). If a claim was dated the day the breach occurred then Amico could indeed have been held liable for any breaches that occurred during the periods in which Bonds I, II or III were in effect even after they had been terminated.

A Customs decision has held that a surety remains obligated not only for breaches which occurred before the date of termination, but for any breaches which arise from obligations secured by the bond during the period it was in effect. Termination may even take place "before there is a breach of the bond as to a liability that was charged before termination." 15 Cust. Bull. 806, C.S.D. 81–29 (1981) (surety obligated to pay duties on any entry covered by a bond was held liable on that bond even after it was terminated, for increased duties if the entry is subsequently reliquidated and higher duties charged.)

Thus the April 1987 letter did not adequately relieve Amico of liability. In that letter, Customs specifically declined to waive its right to assert claims against Pittston for any breaches that occurred under either Bonds I, II, or III. The fact that Bonds I and II had been terminated at the time of this letter, and that Customs declined to confirm the bonds as cancelled, affirms that Customs did not intend to treat the termination of a bond as sufficient to absolve all liabilities under the bond.

Customs's decision to use ambiguous language so that they might pursue a remedy against Amico if they could not satisfy their claims under the new bond justified

1987 letter on which the parties are entitled to

Amico's position until receipt of the September 1987 letter. Pittston's own suggestion that Amico keep the collateral indicates that it too must have recognized the uncertainty of Amico's liability with respect to those bonds.

There is therefore no question of fact that there was no conversion until after Amico received the September 1987 Customs' letter.

*Interest on the Collateral*

■ Pittston's second claim for the loss in value of the collateral on Bonds I and II fails because the collateral for those bonds was fairly held under the terms of the indemnity agreement as discussed above. Therefore, defendants' summary judgment motion as to this claim must be granted.

■ As to Pittston's claim for interest on Bond I while the bond was in effect that request must fail. Both parties agree there was no express agreement regarding interest on the collateral. There is also no statutory requirement for payment of interest on collateral. *Cleveland Chair Co. v. United States*, 214 Ct.Cl. 360, 557 F.2d 244 (1977). Thus the only evidence as to an interest agreement is in the 1985 indemnity agreement which clearly includes Bond I. Thus Pittston waived their right to interest on Bond I by the terms of the agreement.

*Bad Faith Dealings*

■ As to Pittston's third claim, defendants' summary judgment motion is granted because Pittston does not present a material question of fact as to Amico's bad faith dealing in holding the collateral.

The bonds under which these parties' dealings arise are contracts. Therefore, Pittston's request for punitive damages apparently alleges a claim for bad faith breach of contract, which would be a common law cause of action arising under New York law. However, New York does not recognize a "tort of bad faith breach of contract" except in the insurance context. *See e.g., Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 285 N.E.2d 849, 334

rely.

N.Y.S.2d 601 (1972), *cert. denied,* 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973); *All State Vehicles v. Allstate Ins. Co.,* 620 F.Supp. 444 (S.D.N.Y.1985). Even in the insurance context, courts only award punitive damages for bad faith dealing claims where there is a showing of "such morally culpable conduct and wanton dishonesty as to imply a criminal indifference to civil obligations." *Royal Globe Ins. v. Chock Full O'Nuts Corp.,* 86 A.D.2d 315, 449 N.Y.S.2d 740, 743 (1st Dep't.1982), *appeal dismissed,* 58 N.Y.2d 800, 445 N.E.2d 649, 459 N.Y.S.2d 266 (1983). Arguably, the suretyship relationship between Pittston and Amico could be analogous to the insurance context. However, in light of New York's strict standard for awarding punitive damages under breached contract claims, the facts alleged here are not sufficient to constitute bad faith dealings. Therefore defendants' motion for summary judgment is granted as to this claim.

*Conclusion*

Because at least for the moment, the issue of liability has been resolved, Amico's motion for a protective order is denied. Amico's summary judgment motion on the first claim is also denied. Instead, summary judgment on this claim is granted in favor of Pittston. However, summary judgment is granted in favor of Amico dismissing the second and third claims.

Because of the *sua sponte* nature of the relief granted to Pittston, Amico and Shea are granted leave to submit further materials including any factual materials within twenty (20) days with respect to the conclusions reached. Failing such submission, judgment granting the relief sought in the complaint in accordance with this opinion shall be submitted on notice.

It is so ordered.