**William M. BOEHM, d/b/a BB Manufacturing Co., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 282–88C.**

United States Claims Court.

Feb. 11, 1991.

John Curney, Jr., San Antonio, Tex., for plaintiff.

Steven J. Gillingham, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion to dismiss or, in the alternative, for summary judgment. Because the motion incorporated other documents, it will be considered a motion for summary judgment. Plaintiff argued that genuine disputed issues of material fact preclude allowance of the motion.

## FACTS

The United States, acting through the Department of the Army, awarded Boehm Machine Products, Inc., d/b/a BB Manufacturing Co. (BB), two contracts for the supply of steering arm assemblies for use in M113 Armored Personnel Carriers. The two contracts, as amended, called for the delivery of 6,769 steering arm assemblies at a total price of $185,563. BB delivered all of the steering arms under the first contract, but only a portion under the second for the reasons set forth below. The cost to defendant for the delivered units was $141,584.66.

Delivery was stopped after defendant discovered that the steering arm assemblies broke during, or immediately after, installation. Defendant subsequently determined that the material composition of the units did not conform to contract requirements. Tests showed that the handles were made of a substandard alloy treated to a substandard hardness. The

Department of Justice became involved in defendant's claims, and eventually secured a "Settlement Agreement." That Agreement provided, in part:

### I. *Parties*

1. This Settlement Agreement (Agreement) is entered into this 19th day of November 1985, between Boehm Machine Products, Incorporated, d/b/a BB Manufacturing Company (BB Manufacturing), a Texas corporation, William M. Boehm, and the United States of America.

\* \* \* \* \* \*

8. The United States, BB Manufacturing and William M. Boehm desire to settle all civil liability and disputes arising from the performance of the contracts by BB Manufacturing.

9. (c) *The United States shall make available for receipt by BB Manufacturing all remaining steering arm assemblies still in its possession at Red River Arsenal, Texas.* BB Manufacturing and William M. Boehm agree that under no circumstances will any of the steering arm assemblies thus returned to them be at any time subsequent to the signing of this agreement sold, furnished or provided to the United States for any purpose whatsoever.

\* \* \* \* \* \*

11. The United States hereby releases and discharges BB Manufacturing and William M. Boehm, jointly and severally, from any and all claims it may have against them arising out of their performance of the contracts, except for such obligations as are created by this Agreement, and excepting any claims which the United States may have under the Internal Revenue Code, Title 26 of the United States Code.

12. The foregoing constitutes the full and final settlement between the United States, BB Manufacturing and William M. Boehm.

(Emphasis supplied.)

On November 20, 1985 Mr. William M. Boehm for plaintiff, and Mr. Ronald Clark, Attorney, Civil Division, Department of Justice, for defendant, executed the settlement agreement, which defendant had drafted.

A "PROMISSORY NOTE SECURED BY DEED OF TRUST," dated November 18, 1985, on certain real estate owned by plaintiff, or Mr. Boehm personally, accompanied the settlement agreement. The Agreement compromised the Government's claim that BB had fraudulently sold defective steering arm assemblies to the United States Army. Instead, plaintiff agreed to repay defendant $150,000 as "damages," and defendant was to return the steering arm assemblies to BB, which apparently hoped to resell the units to unsuspecting military users of other nations. The Promissory Note provided:

In installments as herein stated, for value received, Boehm Machine Products, Incorporated, d/b/a BB Manufacturing Company, a Texas Corporation, and William M. Boehm, promise to pay the Treasurer of the United States, the sum of One Hundred Fifty Thousand Dollars ($150,000.00), inclusive of interest. Payments of $3,125.00 are to be made to Treasurer of the United States, care of Roy McKinney, Director, Office of Budget, Planning and Evaluation, Civil Division, United States Department of Justice, Washington, D.C. 20530, beginning on December 1, 1985, and continuing in 47 equal monthly installments thereafter.

\* \* \* \* \* \*

*Declaration of Default; Acceleration of Payments.* In the event that the undersigned fails to make any of the payments specified in this note by the date or in the manner required by this note, the United States may, at its option, with notice delivered to the undersigned, declare that this note shall be in default, and the full remaining unpaid balance shall become due and payable, if the past due payment(s) have not been made by the 30th day following the due date of said payment(s) or within 15 days of receipt by the undersigned of the notice of default and intention to accelerate payments, whichever is later.

*Confession of Judgment.* In the event of default, the undersigned hereby consents [sic] to the entry of a judgement against them in the amount of the full remaining unpaid balance plus interest compounded daily, accrued from the date of default, at the Treasury tax and loan account rate in effect on the date of the default, plus the costs of suit and attorney fees.

The emphasized language in paragraph 9(c) of the Settlement Agreement, *supra,* is the cause of the problem. Defendant understood the Settlement Agreement to require it to return to BB the steering assemblies that it had in storage at Red River Arsenal. Arsenal records show that defendant forwarded to plaintiff six cartons containing 349 steering arm assemblies weighing 9,542 pounds. Plaintiff received all 349 units, but discovered that the shipment weighed only 3,370 pounds, an ostensible 6,172 pound shortfall. Plaintiff thereupon demanded return of the "remaining" 6,172 pounds of steering arm assemblies. Defendant maintained that plaintiff received all of the units at the Arsenal, and that the Arsenal's transit weight records must have been in error. Subsequently, however, defendant located an additional 550 steering arm assemblies at another site, which it offered to return at plaintiff's cost. Plaintiff accepted the offer, but unilaterally declared those units outside of the scope of the Settlement Agreement. Plaintiff then claimed that defendant failed to return a total of 3,929 units to which plaintiff was entitled, and that defendant was in default of the Settlement Agreement. It appears from the record that, as a safety precaution, defendant previously had intentionally destroyed and/or disposed of all other units not located at Red River Arsenal.

Plaintiff paid the first payment of $3,125 under the Promissory Note due December 1, 1985, and continued to make the required payments until August of 1986. On September 3, 1986, plaintiff remitted only $500 with the explanation that it could not afford to pay more. Plaintiff continued to make $500 monthly payments through February 1987. On January 28, 1987, plaintiff wrote, "[y]ou have accepted five (5) $500 payments to date, and you will receive a sixth $500 payment when it is due in February[,] and when I decide my business has improved to the point I can increase the installment payments I will increase them."

Defendant chose to forebear taking action under the Settlement Agreement while it investigated the claimed steering arm assembly shortfall, but upon determining that it had returned all units still in its possession, defendant instructed plaintiff to begin repayment at the rate of $3,125 a month beginning February 1, 1987, or face the consequences of default. Plaintiff has continued to refuse to meet the $3,125 per month payment schedule, and has made no payments at all since March, 1987. On September 24, 1987, defendant declared the November 18, 1985 Promissory Note in default, accelerated the maturity date, and demanded full payment of the unpaid balance of $133,895 plus, presumably, interest, costs, and attorneys' fees as permitted in the Promissory Note.

Plaintiff reacted in two ways. On December 3, 1987, it submitted a claim to the Army for breach of contract for defendant's failure to return more than the 349 units. On December 16, 1987, Mr. J. Christopher Kohn, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, denied the claim. On December 4, 1987, plaintiff filed suit against the United States in the United States District Court for the Northern District of Texas, Fort Worth Division, under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.,* claiming that defendant had converted approximately 3,429 units to its own use, and that plaintiff was entitled to damages in the amount of $78,580, plus interest and costs. Plaintiff later increased its claim to $182,763, which ostensibly represented the alleged fair market value of the "missing" units. Plaintiff filed the present suit on May 10, 1988. Shortly thereafter, on July 8, 1988, the district court dismissed the tort claim upon defendant's unopposed motion.

## DISCUSSION

Summary disposition requires that no genuine dispute exist as to any material

fact, so that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The focus in determining whether summary judgment is appropriate is the absence or presence of disputed material facts. A "material fact" is a fact that will make some difference in the outcome of a case. *Curtis v. United States*, 168 F.Supp. 213, 216, 144 Ct.Cl. 194 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). In considering a motion for summary judgment, the court must view evidence, and draw inferences in a light most favorable to the non-moving party, and must resolve any doubt against the moving party. *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146 (Fed.Cir.1983); *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985). In determining a motion for summary judgment the court will, absent persuasive reason to the contrary, deem as established those material facts the moving party claims and adequately supports, unless such material facts are included in the opposing party's Statement of Genuine Issues, RUSCC 56(d)(2), and are controverted by affidavit, or other written or oral evidence, RUSCC 56(d)(3), and Appendix H.

*The 28 U.S.C. § 1500 Bar Of Jurisdiction*

■ Defendant argued at length that this court lacks jurisdiction to adjudicate the case because doing so would run afoul of 28 U.S.C. § 1500, which prevents the United States Claims Court from hearing any claim if plaintiff has a similar suit against the United States pending in any other court. "The purpose of Section 1500 is to prohibit the filing and prosecution of the same claims against the United States in two courts at the same time." *Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1562 (Fed.Cir.1988). The parties argued the purpose of the legislation, the nature and purpose of the two suits, what

constituted a claim, the degree of required similarity of relief sought, and the jurisdiction of the "other" court. Defendant argued that the district court's dismissal of plaintiff's case before jurisdiction was challenged here was irrelevant. Defendant is incorrect. The law in the Claims Court is as set forth in *Brown v. United States*, 358 F.2d 1002, 1005, 175 Ct.Cl. 343 (1966), to wit; if the claim in the other court has been adjudicated fully on the merits, the decision is *res judicata* upon this court or, if the "other" claim still is pending at the time the § 1500 challenge is made, the Claims Court lacks jurisdiction. But, if the claim in the other court no longer is pending, "there is no basis in the policy or wording of the statute for dismissal of the claim pending [in the Claims Court]."[1] *Id.*

*Interpretation Of The Section 9(c) Settlement Agreement*

Defendant claimed it fulfilled its requirement set forth at paragraph 9(c) of the Settlement Agreement by surrendering to plaintiff "all remaining steering arm assemblies still in its possession at Red River Arsenal," *i.e.*, the 349 units it forwarded to plaintiff. Plaintiff alleged defendant led it to believe that in consideration for executing the Settlement Agreement, defendant would return several thousand defective steering arms. Plaintiff interpreted paragraph 9(c) to mean that defendant would gather together at the Red River Arsenal from wherever they had been sent, all remaining steering arm assemblies still in the government's possession. Plaintiff argued that the phrase "all remaining steering arm assemblies still in its possession at Red River Arsenal" reasonably is subject to two equally meaningful interpretations. Plaintiff, naturally, prefers its interpretation that the Arsenal merely was to be a collection point for units shipped from around the world. Plaintiff characterized its interpretation as "clear" because it had agreed

1. The court notes that *UNR Indus., Inc. v. United States*, 911 F.2d 654 (Fed.Cir.1990), which relied heavily on the *Brown* interpretation of § 1500, recently was vacated and withdrawn by the Court of Appeals for the Federal Circuit, which ordered additional briefing on the § 1500 issue for an *en banc* rehearing. *UNR Indus., Inc. v. United States*, 926 F.2d 1109 (Fed.Cir.1991). However, as of the date of this order, *Brown* still is good law, and in any case, the issue is not crucial to this decision.

to pay $150,000 to defendant in return for the steering arm assemblies, and maintains that it would have been sheer foolishness on its part to agree to pay defendant $150,000 if, in return, it would receive assemblies worth but $6,980.00, the alleged resale value of those 349 units actually returned. The court, at this point, is not overly concerned with the resale value of the steering arm assemblies, and cannot ignore the more intangible forms of consideration present, such as the obvious pressures on plaintiff to settle the case in light of the possibility of criminal and civil fraud, default termination, and reprocurement costs. The mere threat of invoking any one, or a combination, of those remedies has had remarkable impact upon contract suppliers of defective military hardware. Mr. Boehm's assertion, that had he known so many assemblies had been destroyed he would not have settled but "forced the Government's hand regarding a lawsuit for fraud," is shallow.

 It is well established that where the provisions of a contract are phrased in clear and unambiguous language, "the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations of the parties...." *Elden v. United States*, 617 F.2d 254, 260–61, 223 Ct.Cl. 239 (1980); *accord American Science & Eng'g, Inc. v. United States*, 663 F.2d 82, 88, 229 Ct.Cl. 47 (1981). In addition, *all* parts of the contract must be read together and harmonized. *Hol–Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979, 169 Ct.Cl. 384 (1965), and single phrases of the contract are not to be read out of context or to the exclusion of others. *Id.* 351 F.2d at 979. An interpretation that gives reasonable meaning to all parts of the contract is vastly preferable to one that leaves portions of the contract meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985), *citing United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983). A corollary to these principles is that a court should reject any interpretation which would render portions of the contract meaningless, useless, ineffective, or superfluous. *United Pac.*

*Ins. Co. v. United States*, 497 F.2d 1402, 1405, 204 Ct.Cl. 636 (1974); Restatement (Second) of Contracts § 203(a) (1981). Equally clear is the maxim that where a latent ambiguity exists in a contract, as alleged here by plaintiff, the court must give the language the meaning derived "by a reasonably intelligent person acquainted with the contemporaneous circumstances" surrounding the contract. *Hol–Gar Mfg. v. United States*, 351 F.2d 972, 975, 169 Ct.Cl. 384 (1965); *John C. Grimberg Co. v. United States*, 7 Cl.Ct. 452, 456 (1985). But, the interpretations of the disputative parties each must be reasonable. *Grimberg*, 7 Cl.Ct. at 456. If the language is susceptible to more than one reasonable interpretation, the court, following the rule of *contra preferentum*, will resolve the ambiguity in favor of the party who did not draft the language. *Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853, 861 (1987).

 The court cannot find a latent or patent ambiguity in paragraph 9(c) of the Settlement Agreement. The language at issue states simply that "[t]he United States shall make available for receipt by BB Manufacturing all remaining steering arm assemblies still in its possession at Red River Arsenal, Texas." It can have but one reasonable meaning, *i.e.*, in its simplest terms plaintiff is entitled to all units the Army still had at the Red River Arsenal. The phrase "still in its possession" is not set off by commas, which could lead to an ambiguity, and it contains the word "still," meaning only units that were at the Arsenal, and always had been at the Arsenal. The exception to the doctrine known as the rule of the last antecedent is not applicable because of the absence of commas separating any modifying clause. But more importantly, the court cannot ignore the fundamental principle of construction that a document in question must be read in its entirety. The court cannot construe a phrase without references to the document as a whole. *United States v. Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984).

In the present circumstances, the court cannot admit parole evidence to alter the

clear meaning of paragraph 9(c). *Design & Prod., Inc. v. United States*, 18 Cl.Ct. 168, 196 (1989); *Montana Power v. United States*, 8 Cl.Ct. 730, 735 (1985). The court may, however, review factual events preceding and following execution of the Settlement Agreement to buttress its findings. The record strongly indicates that both parties knew there were only a few hundred steering arm assemblies at Red River Arsenal. For example, defendant, upon plaintiff's *quaere* at one point in the negotiation, estimated as 450 the number of units at the Red River Arsenal. Following receipt of the 349 units, plaintiff asked, "where are the rest of the 450 units?" Later, plaintiff asked for the rest of the "850" Red River Arsenal units. Neither request was near the 3,929 plaintiff now claims. Moreover, were the court to consider parole evidence in interpreting paragraph 9(c), it arguably would be influenced more by defendant's acknowledgement that, during negotiations leading to the Settlement Agreement, plaintiff asked to receive simply "all remaining steering arm assemblies in the possession of the United States." Mr. Clark, the Department of Justice negotiator, rejected that language out of hand which led to the much more restrictive language ultimately accepted by plaintiff.

Plaintiff received what it bargained for, *i.e.*, several hundred steering arm assemblies still in defendant's possession at Red River Arsenal on the date of execution of the Settlement Agreement. The United States was under no obligation to return units it did not have, nor was it obligated, especially prior to settlement, to refrain from disposing of broken or new units, in order to prevent inadvertent use, at sites other than Red River Arsenal, including especially Mainz, Germany, where defendant first identified the non-specification steering arm assemblies.

*Improper Inducement To Settle And Breach*

██ Notwithstanding the foregoing, the court is compelled to address plaintiff's argument that the Settlement Agreement must be rescinded because of improper behavior by defendant during the negotiations leading to settlement execution, and actions thereafter. Specifically, plaintiff alleged that defendant seduced it to settle by its failure to deal fairly and in good faith, and intentionally or innocently misrepresented the number of steering arm assemblies extant. Plaintiff also alleged breach of contract, tortious breach of contract, and fraudulent inducement to settle.

All of plaintiff's claims are comprised of the same general alleged fact pattern; to wit: (1) defendant knew that many of the steering arm assemblies had been destroyed or disposed of at the time of negotiation of the Settlement Agreement; (2) defendant implied that there were many more units available than there actually were; (3) plaintiff believed that almost half of the units it had delivered to defendant would be returned; and (4) had plaintiff been privy to the true facts, it would not have executed the Settlement Agreement. The court finds no merit to any of plaintiff's claims, nor do they raise genuine issues of material fact that could in any way alter the outcome of the case. *See Curtis v. United States*, 168 F.Supp. 213, 216, 144 Ct.Cl. 194 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959); RUSCC 56(d)(3), and Appendix H.

The court reviewed the file with great particularity, and failed to locate any substantiation of plaintiff's arguments. Plaintiff cited to various depositions in support of its position but, upon analysis, those statements fail to support plaintiff's bare assertions. The record is clear that at the time the parties negotiated the settlement, defendant had searched diligently worldwide, and had found only the assemblies at the Red River Arsenal. Plaintiff has presented absolutely no sound argument to support its belief that there were more than a few hundred units still in existence. The court finds the record devoid of any explicit or implicit knowledge on the part of defendant that more units existed than as discussed, except for, after the fact, the 550 units discovered later and offered to Mr. Boehm. Defendant certainly made no statements that are not in accord with the facts as known then, and now. Plaintiff

must show a nexus between defendant's conduct, and a violation of the duty it owed plaintiff to deal fairly and in good faith. Plaintiff failed to do more than simply allege a breach of a duty, and has fallen far short of a showing of genuine issue of material fact sufficient to meet the requirements of RUSCC 56 and Appendix H.

■■■ In addition, the remedy of recision is an equitable remedy that generally is outside the jurisdiction of this court. This is a court of specific jurisdiction, and the Tucker Act, 28 U.S.C. § 1491 et seq., the organic act of the court, never has been a valid jurisdictional source for the court to address general equitable remedies. *Cleveland v. United States,* 9 Cl.Ct. 741, 747 (1986).[2] This court cannot grant pure equitable relief, such as recision. *United States v. Testan,* 424 U.S. 392, 397–98, 96 S.Ct. 948, 952–53, 47 L.Ed.2d 114 (1976); *United States v. King,* 395 U.S. 1, 3–5, 89 S.Ct. 1501, 1502–03, 23 L.Ed.2d 52 (1969). "[Our] jurisdiction is limited to money claims against the United States Government." *Testan,* 424 U.S. at 397–98, 96 S.Ct. at 953. In the circumstances present in this case, the court has no authority to rescind the Settlement Agreement. That doctrine is based not on any agreement, but is equitable in nature. It proceeds from a perception that a party ought not to be bound, even though the party has agreed to be bound. *See Cleveland Chair Co. v. United States,* 557 F.2d 244, 214 Ct.Cl. 360 (1977). This court's equitable authority is directed only to "contract claim[s] brought before the contract is awarded ..." 28 U.S.C. § 1491(a)(3). That is to say, our equitable jurisdiction can be invoked only when there is a breach of the implied contract to consider all responsive bids fairly and honestly. *United States v. Grimberg,* 702 F.2d 1362, 1367 (Fed.Cir. 1983); *Ingersoll–Rand Co. v. United States,* 2 Cl.Ct. 373, 375 (1983). Moreover, this court must construe strictly Congress's waiver of sovereign immunity in Section 1491(a)(3), and may not expand it by implication. *International Graphics v. United States,* 4 Cl.Ct. 186, 192 (1983); *Speco Corp. v. United States,* 2 Cl.Ct. 335, 336 (1983).

■■■ Defendant quite rightly challenged plaintiff's breach and "misrepresentation" issues as sounding in tort and, therefore, also beyond this court's authority.[3] There can be no argument that this court is without authority to adjudicate tort claims. The Tucker Act specifically deprives the court of any claims "sounding in tort." 28 U.S.C. § 1491(a)(1). The United States Court of Claims, prior to its incarnation as the United States Court of Appeals for the Federal Circuit, took a firm position with tort claims, even those affecting a contract.

The decision of the Supreme Court in *United States v. Neustadt,* 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), removes any doubt that claims based on negligent misrepresentation, wrongful inducement, or the careless performance of a duty allegedly owed, are claims sounding in tort. [*Somali Dev. Bank v. United States,* 508 F.2d 817, 821 (1974).] Tort claims, of course, are expressly beyond our Tucker Act jurisdiction. *Aetna Casualty & Sur. Co. v. United States,* 655 F.2d 1047, 1059, 228 Ct.Cl. 146 (1981).

Notwithstanding *Aetna,* as early as 1971, the Court of Claims recognized the validity of a tortious breach of a contract as within the Tucker Act because the substance of that claim is contractual breach rather than a duty primarily sounding in tort. *Bird & Sons, Inc. v. United States,* 420 F.2d 1051, 1054, 190 Ct.Cl. 426 (1970). That the court might consider plaintiff's breach and misrepresentation claims is but, however, a pyrrhic victory. Plaintiff failed to present any substantive rebuttal to defendant's motion for summary judgment.

---

**2.** The court may, however, in circumstances not present here, exercise the remedy of recision when such exercise is incidental to the court's general jurisdiction. *Marathon Oil Co. v. United States,* 17 Cl.Ct. 116, 119 (1989).

**3.** Plaintiff pled as tortious only the "misrepresentation" claim, but because the issues are substantially identical in both claims, the court has lumped them into the same tort basket, *i.e.,* notwithstanding the "breach" title, the issues are tortious in nature. The court will look at the substance of the pleading, not the "title" plaintiff assigns.

The record is devoid of any evidence that defendant did not deal with plaintiff fairly and in good faith during Settlement Agreement negotiations, that it fraudulently induced plaintiff to settle, or that it intentionally or innocently misrepresented the facts. Neither did defendant breach the contract, tortiously or otherwise. There is not a scintilla of evidence that defendant had any knowledge of the number of steering arm assemblies of which plaintiff was not aware. The court finds that the parties dealt with each other honestly and openly.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is allowed. Plaintiff's default under the Promissory Note entitled defendant to the full amount remaining due and owing in that document. Plaintiff's request that the motion for summary judgment be denied, the case scheduled for trial, and for a finding in favor of plaintiff in the amount of $182,763 plus interest and attorney fees is denied. The complaint is dismissed. The Clerk of the court is directed to enter judgment in favor of defendant on its counterclaim in the amount of $133,895 plus interest, attorney fees, and costs, as provided for in the Promissory Note, as well as costs incurred in defending the United States before this court.

IT IS SO ORDERED.