ORANGE COVE IRRIGATION
DISTRICT, an Irrigation
District,

v.

The UNITED STATES.

No. 91–1099L.

United States Court of Federal Claims.

Aug. 10, 1993.

Tim O'Laughlin, Oroville, CA, Atty. of Record for plaintiff.

K. Jack Haugrud, Washington, DC, with whom was Acting Asst. Atty. Gen. Myles E. Flint, for defendant (Christina Kalavritinos, Dept. of the Interior, of counsel).

## OPINION

YOCK, Judge.

The plaintiff irrigation district in this action seeks a refund of money paid to the Federal Government for irrigation water

used by sixteen landowners/members of the plaintiff's irrigation district when these landowners failed to complete and have on file their eligibility certification forms prior to a set date. The amount at issue represents the difference between the subsidized contract rate and the full cost rate for deliveries of reclamation project water to these sixteen landholders in the plaintiff's irrigation district. The plaintiff alleges that the United States Bureau of Reclamation breached its contractual agreement when it assessed these costs and, furthermore, lacked the authority to assess the full cost of the water delivered. Trial was held on February 9, 10, and 11, 1993, in Sacramento, California.

Upon full consideration of the entire record, including the parties' post-trial briefs, the Court concludes that the Government breached its contractual obligation of fair dealing under the circumstances here present and that the Bureau of Reclamation's assessment of full cost for the water represents an unlawful penalty. As such, the plaintiff is entitled to recover the amount claimed.

### *Factual Background*

### I. Background of Reclamation Law

The United States became fully involved in the construction and operation of western irrigation projects at the turn of the century, when Congress enacted the Reclamation Act of 1902. In enacting the Reclamation Act, Congress hoped to spur the growth of an agricultural society in the West by providing affordable irrigation water to relatively small, individual landholders. *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275, 292, 78 S.Ct. 1174, 1184, 2 L.Ed.2d 1313 (1958). From the beginning, the policy, as declared by Congress, was to require that the benefits be made available to the largest number of people, consistent with the public good. *Id.* To accomplish this, Congress established eligibility requirements for recipients of reclamation project water to prevent land speculation and the monopolization of lands in the hands of a few individuals. *Peterson v. United States*, 899 F.2d 799, 802–03

(9th Cir.), *cert. denied*, 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990). The two most notable eligibility requirements were that a landowner could own no more than 160 acres of irrigated land and had to be a "bona fide resident" on the land or reside in the neighborhood of the land. 43 U.S.C. § 431 (1982).

The Department of the Interior ("Department"), through the Bureau of Reclamation ("Bureau") constructed the irrigation projects and initially assumed responsibility for monitoring and distributing the water to the individual landholders. *Peterson*, 899 F.2d at 804. In 1926, Congress amended the reclamation laws to remove from the Bureau the responsibility for distributing the water and monitoring its use. *Id.* (citing the Omnibus Adjustment Act § 46, 43 U.S.C. § 423e (1982)). Instead, the amendment directed the Secretary of the Interior to enter into contracts with irrigation districts organized under state law. *Id.*

Under this system, which remains in effect today, the irrigation districts execute contracts with the actual users of the water and deliver the water to them. The irrigation districts, rather than the Bureau, are responsible for ensuring that the recipients of project water comply with reclamation law, including any eligibility requirements. *See id.; see also United States v. Tulare Lake Canal Co.*, 535 F.2d 1093, 1094 (9th Cir.1976); *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1156, 51 L.Ed.2d 571 (1977). The Bureau's role is limited to regulating and to distributing subsidized water to the irrigation districts. Within the Bureau, the Commissioner of Reclamation ("Commissioner") lies at the top of the chain of command, followed by the Regional Directors, who, in turn, direct the Project Superintendents. In most cases, the Bureau's edicts are ultimately communicated to the various irrigation districts through the Project Superintendents.

The price that the districts are charged for federal water is based on the expenses incurred by the Government in providing the water, such as the cost of constructing and maintaining the dams and canals. There is no charge for interest on the con-

struction expense. This lack of an interest charge constitutes a substantial subsidy. During the time at issue in this case, the Orange Cove Irrigation District ("OCID") paid $3.50 per acre-foot of water, while the actual cost to the United States of providing this water was $31.31 per acre-foot.

Limiting this subsidy to eligible recipients has long been a problem in reclamation law. By the 1950s, the 160–acre limitation had been effectively circumvented by leasing. Because reclamation law and the water contracts did not expressly prohibit the water districts from providing water to farms of more than 160 acres if the land was leased rather than owned, for decades districts delivered subsidized water to farms consisting of thousands of acres of leased land. *Peterson*, 899 F.2d at 801, 804–05. Moreover, even though reclamation law technically required that the recipient of project water reside on or in the neighborhood of the land, the Department ignored this residency requirement altogether after 1926. *Id.* at 805.

To curb these abuses and attempt to limit the subsidy being provided, Congress significantly amended the reclamation laws in 1982 with the passage of the Reclamation Reform Act ("the RRA"), codified primarily at 43 U.S.C. §§ 390aa–390zz (1982). Among other things, the RRA eliminated the "leasing loophole" by requiring that the full cost be paid for water delivered to leased lands in excess of the acreage entitlement. At the same time, the never enforced residency requirement was eliminated and the 160–acre limitation was increased to 960 acres to better reflect modern farming techniques. 43 U.S.C. § 390ee, 390kk (1982).

To help enforce the acreage limitation and other eligibility requirements, the RRA requires each landowner and lessee to provide a certificate that they are in compliance with the provisions of the RRA. 43 U.S.C. §§ 390ff (1982). The completion and submission of these forms is an eligibility requirement, and failure to submit the forms on time renders the landholder ineligible to receive water until the forms are properly submitted. 43 C.F.R. § 426.10(k) (1987). This requirement, known as the "no forms, no water" policy, is the most effective enforcement mechanism the irrigation districts have for ensuring that landholders who receive project water are eligible and submit the required forms. The RRA also requires the irrigation districts to compile records and information needed by the Secretary of the Interior to implement the RRA and prior reclamation law. 43 U.S.C. § 390zz (1982).

## II. Facts Specific to This Controversy

The genesis of this case arose in 1986, when the Bureau of Reclamation began amending its regulations to implement provisions of the RRA, particularly section 203(b), commonly known as the "hammer clause." The hammer clause gives the irrigation districts the option of amending their pre-existing contracts to conform to the RRA's new provisions or continuing under their old contracts provided that they pay "full cost" for water to any leased lands in excess of 160 acres. 43 U.S.C. § 390cc(b) (1982). The proposed amended regulations were issued on November 7, 1986. 51 Fed.Reg. 40,742 (1986). To conform to the proposed regulations, the reporting forms needed revision to require disclosures not only by farm owners, but also by those leasing or operating farms.[1]

Initially, officials at the Bureau of Reclamation assumed that the final regulations would be substantially similar to the proposed regulations. As a result, new *reporting* and *certification* forms were created for the 1987 water year that required disclosure of the new information needed under the proposed regulations. Thus, the new 1987 reporting and certification forms required disclosures relating not only to ownership, but also to the leasing and operating of farms. The new 1987 forms were sent to OCID at the end of January, 1987.

---

1. Since the passage of the RRA, landholders who hold more than 40 acres and who do not elect to come under the new law are required to file reporting forms, while those who do elect to come under the new law are required to file certification forms. Aside from the name given to the form and the color of the cover, the two forms are essentially the same.

As it turned out, the proposed regulations engendered considerable opposition from the regulated community. One of the items that many in the regulated community opposed was the inclusion of "operated" lands in the calculation of acreage limitations. Ultimately, the Bureau decided to reexamine fully its proposed regulations to determine whether they should be modified. At the same time, because the new 1987 reporting and certification forms were based on the proposed regulations, it became apparent that the 1987 reporting and certification forms might also need revision. Therefore, the Bureau orally told OCID and the other irrigation districts not to distribute the 1987 reporting and certification forms to their landholders until the Bureau had decided whether they would be revised.

It soon became obvious that the 1987 forms would not be finalized and available until after the irrigation season began.[2] To avoid the hardship that would result if water deliveries were not allowed until the Bureau finalized and distributed the new forms, the Commissioner suspended the "no forms, no water" policy and authorized the initiation of water deliveries to the irrigation districts on the condition that the irrigation district manager would assure the Bureau that the forms would be completed expeditiously when they became available.

In accordance with the Commissioner's instructions, the Bureau's Project Superintendent for the Fresno Project Office authorized the irrigation districts, by letter dated March 24, 1987, to begin water deliveries without the completion of the forms. The conditions placed on the delivery of water were as follows:

These deliveries are to be made with your assurance that when a completion date for the forms has been determined, the new forms will be returned expeditiously. Water deliveries should not be initiated to any users who have declared they are not willing to comply with certi-

fication or reporting requirements. We recognize that problems may develop as a result of delivering irrigation water before completion of the required forms. Therefore, the districts should make every effort to obtain compliance and complete the required forms later in the water year.

Given this conditional authorization, the plaintiff in this case, OCID, began water deliveries to its eligible landowners/members in March of 1987.

The final regulations were issued in April, 1987, and differed in certain respects from the proposed regulations. For example, unlike the proposed regulations, the final regulations did not require disclosure of information relating to "operating" a farm. 52 Fed.Reg. 11,940 (1987). As a result, the 1987 reporting and certification forms, which requested disclosure of information regarding operating a farm, were rendered obsolete. Ultimately, however, the Bureau decided that reprinting the 1987 forms was unnecessary because the forms merely asked for too much information and could be corrected by issuing revised instructions for filling them out.

In accordance with the Bureau's decision, the Fresno Project Office sent out "errata sheets" to its irrigation districts on June 11, 1987, that contained the revised instructions for filling out the 1987 forms. At about that time, the Fresno Office orally gave OCID permission to distribute the forms and the errata sheets to its landholders. OCID sent out the reporting and certification forms to its landholders/members by memorandum on June 19, 1987, and instructed the landholders to complete the forms "as soon as possible." No completion date was set by the Bureau at that time for the 1987 forms, and other than sending out the June 19, 1987 memorandum, OCID made no other effort in 1987 to ensure that the individual landholders returned the forms.

On August 28, 1987, the Bureau of Reclamation directed OCID to submit a sum-

---

**2.** The water year begins March 1 and runs through the end of February of the following year. The irrigation season generally runs from March through November, with 75 percent of the project water delivered during the months of June, July, August and September.

mary of the reporting and certification forms it had received from the individual landholders by September 25, 1987. In addition, the August 28 memorandum directed OCID to identify the number of landholders that had not filed forms and state the reason for "non-compliance." OCID missed the September 25 deadline established by the Bureau for submitting its summary form, but did provide it to the Bureau on approximately October 16, 1987. The summary form listed 78 nonfiling landholders, but OCID did not specify whether these were noncomplying landholders or simply individuals who had not taken project water in 1987. The Mid–Pacific Region mistakenly interpreted the summary forms as an indication that all landholders within OCID who had received 1987 project water had filed a reporting or certification form with OCID, and informed the Commissioner that it was unaware of any noncomplying landholders.

On October 20, 1987, the Bureau informed OCID and the other districts that they should discontinue the delivery of water to any landholders who had not completed the 1987 reporting and certification forms. The letter advised the districts that the continued delivery of water to noncomplying landholders was a violation of reclamation law. By the time OCID received the letter, however, all of its landholders/members had already taken all of the water that they needed for the year. Thus, the Bureau's directive failed to have the intended effect of inducing OCID's landholders to return their forms.

On February 9, 1988, the Bureau directed the irrigation districts to withhold all 1988 water deliveries to their landholders/members until they had submitted both their 1987 and 1988 forms. The memorandum restated the "no forms, no water" policy and informed the districts that if they delivered 1988 water to landholders who had not completed both their 1987 and 1988 forms, the districts would be billed at the full-cost rate for all water delivered in 1988 during the period of noncompliance. The memorandum also urged OCID to share this information with its water users.

In the meantime, the Bureau asked the Solicitor's Office of the Department of the Interior for a legal opinion on whether full-cost charges could be assessed against those landholders who had received water during 1987 and had not completed their forms. On March 8, 1988, the Solicitor's Office advised the Bureau that it could lawfully charge the districts full cost for deliveries of water to landholders who were ineligible to receive water by virtue of their failure to file reporting and certification forms.

On March 31, 1988, the Commissioner wrote a letter to the Regional Directors directing them to advise all irrigation districts that a deadline of May 2, 1988, had been set for the completion of 1987 forms. The Commissioner also stated that full cost was to be assessed for deliveries made to landholders who had received water during the 1987 water year but who had not completed the necessary forms by the May 2 deadline.

Although OCID was not yet known to have noncomplying landholders, the Mid–Pacific Region followed the Commissioner's instructions and sent a memorandum to OCID on April 12, 1988, instructing it to take "specific actions" to get all landholders to complete and file their 1987 forms by May 2, 1988. The memorandum also informed OCID that it would be billed the full cost rate, including interest, for all water delivered by the district to non-complying landholders during the 1987 water year. Finally, the memorandum reiterated the Bureau's claimed willingness to assist OCID in gaining compliance.

OCID received the April 12, 1988, memorandum on about April 18, 1988. Upon receiving the memorandum, OCID sent a letter to its landholders notifying them of the May 2, 1988, deadline. By letter dated May 5, 1988, OCID informed the Bureau that 22 of its approximately 700 landholders/members had not filed their 1987 forms by the established deadline of May 2, 1988. Sixteen of these landholders had actually received project water during 1987.

On June 23, 1988, the Bureau sent a bill to OCID for $67,701.20, representing the difference between the subsidized contract rate and the full cost rate, plus interest, for the deliveries of water made by OCID to the sixteen noncomplying landholders. By the time OCID received this assessment letter, all but two of these landholders had filed their required forms. The remaining two landholders filed their 1987 forms in July and August of 1988. Aside from failing to submit their forms by the established completion date, all of the late filing sixteen landholders were otherwise eligible to receive the project water that they had taken in 1987.

OCID initially refused to pay the assessed bill. In February of 1989, however, OCID's water contract with the Government was about to expire. Under the contract, OCID had a right of renewal only if it was in full compliance with reclamation law. In order to have its contract renewed, OCID paid $70,853.80 ($62,409.83 of which was principal, and $8,443.97 of which was interest) under protest to the Bureau of Reclamation on February 15, 1989. After paying the disputed amount, OCID administratively pursued a tort claim against the Bureau under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80 (1988). OCID's claim was denied by the Solicitor's Office of the Department of the Interior on October 18, 1989. OCID then filed suit in the District Court for the Eastern District of California. After the administrative record was filed and limited discovery was completed, the parties filed cross-motions for summary judgment. As part of its motion, the United States argued that the district court lacked subject matter jurisdiction over the claim. The district court agreed and determined that exclusive jurisdiction was vested in the United States Claims Court, except for the constitutional due process claim. The district court declared that the Claims Court (now the United States Court of Federal Claims) could provide the plaintiff full relief and dismissed all of the claims without prejudice. OCID then filed a complaint in this Court on April 18, 1991.

## Discussion

Plaintiff makes several arguments in support of its position that it is entitled to a refund of the full cost water charges that it paid pursuant to the Bureau's assessment. First and foremost, the plaintiff maintains that its duties are passive and are limited to making the forms available, receiving the forms, and filing the forms. In this regard, the plaintiff contends that nothing in the RRA, the regulations, or its contract with the Bureau places on it the affirmative duty of collecting the forms. Second, the plaintiff maintains that it met all three of the enumerated conditions for delivery of water set forth in the March 24, 1987, modification. Third, the plaintiff contends that the May 2, 1988, deadline established by the Bureau for the return of 1987 forms was unreasonable and unenforceable. In support of this argument, the plaintiff touches upon a number of legal theories, including the implied covenant of good faith and fair dealing, public policy, and equitable estoppel. Finally, the plaintiff maintains that the Bureau lacked the legal authority to charge full cost for the water delivered in 1987, as such an assessment constitutes a penalty.

In contrast to the plaintiff's position, the Government maintains that the plaintiff had an affirmative duty to collect forms from the landholders/members who received water in 1987 because under reclamation law, the plaintiff could deliver water only to landholders/members who filed forms. Second, the Government contends that the plaintiff violated two of the listed conditions in the March 24, 1987, modification by failing to make any real effort to have the forms filed in the 1987 water year and by missing the ultimate deadline established by the Bureau for submission of the forms. Third, the Government disputes the plaintiff's contention that the May 2 deadline is unreasonable and unenforceable. Finally, the Government argues that the assessment of full cost for delivery of water to ineligible recipients is not a penalty and represents an appropriate measure of damages for the plaintiff's alleged breach of contract.

**I. Federal Reclamation Law**

■ The first step in this matter is to determine the nature of OCID's contractual responsibilities as they existed prior to the March 24, 1987, letter. To begin with, it is clear that neither the original written water service contract entered into by OCID and the United States on May 20, 1949, nor federal reclamation law contemplated the series of events that occurred during the 1987 water year. Under the original water service contract, OCID had essentially three duties, none of which are relevant to the present dispute: (1) to submit timely payment for the delivery of water, subject to a penalty for delinquency in payment, (2) to keep books and records and to report crop and other data, and (3) to negotiate, at its option, amendments of the contract consistent with the provisions of any repeal or amendment of the federal reclamation laws.

OCID's contractual duties are supplemented by its statutory duties as set forth in the RRA. As for OCID's duties pertaining to certification and reporting forms, the RRA provides the following:

As a condition to the receipt of irrigation water for lands in a district which has a contract as specified in section 390cc of this title, each landowner and lessee within such district shall furnish the district, in a form prescribed by the Secretary, a certificate that they are in compliance with the provisions of this subchapter including a statement of the number of acres leased, the term of any lease, and a certification that the rent paid reflects the reasonable value of the irrigation water to the productivity of the land.

43 U.S.C. § 390ff (1982). The Government argues that because OCID may deliver water only to the landholders/members who have filed forms, OCID must necessarily collect forms from each landowner who takes project water. While it is true that OCID may lawfully deliver project water only to those landholders who file forms as the statute indicates, filing of the forms with OCID is ordinarily a prerequisite for the receipt of project water. Thus, in any normal water year, the onus of completing and returning the reporting and certification forms to OCID is on the shoulders of the individual landholders. If the landowners do not file the forms, they do not get any water. OCID is tasked with delivering water only to those landholders who filed their forms, but OCID is not responsible for actively collecting the forms once it has made them available.

The adoption of the final implementing regulations on April 13, 1987, expanded OCID's responsibilities only slightly. With regard to certification and reporting forms, the final regulations provide the following:

(h) *District participation.* Each district shall be required to make the necessary blank certification and/or reporting forms available to district landholders and to keep the current certification and reporting forms on file and available for Bureau of Reclamation inspection. All superseded certificates and reports should be retained by the district for 3 years, and thereafter may be destroyed by the district, except that the last fully completed certification and reporting form (other than the verification form) must always be kept on file with the current verification form so that all the landowners' and lessees' land may be identified. Additionally, each district will be required to summarize the information contained on these documents and submit the summary to the Bureau of Reclamation annually. The summary form to be used by the district will be provided by the Bureau of Reclamation. The district shall notify the Bureau of Reclamation of any discrepancies in the certification and reporting forms.

43 C.F.R. § 426.10(h) (1987). It is clear from these regulations that OCID was not responsible for physically collecting the forms. Essentially, OCID's role was three-fold: (1) to make the forms available to the landholders, (2) to keep the completed forms on file, and (3) to prepare annual summary forms for the Bureau of Reclamation. Prior to 1987, there was no need for OCID to actively collect the reporting and certification forms because the "no

forms, no water" policy ensured that landholders who wanted to take project water in any given year would return their forms to OCID.

## II. The Modification of March 24, 1987

The next issue to be addressed in this dispute is how the memorandum of March 24, 1987, modified OCID's responsibilities. As discussed previously, in the 1987 water year, the "no forms, no water" policy could not equitably be enforced at the beginning of the irrigation season because the Bureau had not yet finalized the forms to use. To avoid this hardship, the Bureau, through the March 24, 1987, memorandum that it sent to OCID, offered to extend the deadline for filing the forms so that landholders/members could begin receiving water while the forms were being finalized. The March 24, 1987 memorandum thus waived the forms filing requirement and authorized OCID to begin delivery of project water in 1987 without receipt of the required forms under three conditions, which were as follows:

> ■ These deliveries are to be made with your assurance that when a completion date for the forms has been determined, the new forms will be returned expeditiously. [2] Water deliveries should not be initiated to any users who have declared they are not willing to comply with certification or reporting requirements. * * * [3] Therefore, the districts should make every effort to obtain compliance and complete the required forms later in the water year.

OCID accepted the Bureau's offer by delivering project water to its landholders throughout the 1987 irrigation season. Thus, the March 24, 1987, memorandum can be viewed as a modification of the existing water service contract for the 1987 water year.

■ The Government contends that OCID breached the terms of the modification by failing to meet the May 2, 1988, deadline established by the Bureau for returning the forms. The Government bases its argument on the first condition of the March 24, 1987, modification, which provided that OCID would return the new forms "expeditiously" once a completion date for the forms had been determined. In the Government's view, this provision meant that once a completion date had been determined, OCID would return the forms expeditiously, but no later than the completion date.

OCID, on the other hand, argues that the provision merely provided the manner in which OCID would assure the return of the forms once a completion date had been established. According to OCID, then, this condition contained in the March 24, 1987, modification did not provide that OCID would assure return of the forms by the completion date. Instead, the provision meant that once the Bureau set a completion date, OCID would assure return of the forms in an expeditious manner. OCID's argument in the alternative is that the provision is ambiguous. Therefore, OCID argues, the provision in dispute should be construed against the Government because the Government, as drafter of the provision, failed to clearly state the manner in which the forms should be returned.

■ It is often stated that the provisions of a contract must be construed in a way that will effectuate the spirit and purpose of the contract. *See, e.g., Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979). As a general matter, the plain language of a contract is controlling, and only language that is reasonably susceptible to more than one meaning may be considered ambiguous. *Thermal Elec., Inc. v. United States,* 25 Cl.Ct. 671, 673 (1992). The mere fact that the parties involved do not agree upon the meaning of the language in a contract does not necessarily render the language ambiguous. *Id.* Instead, there must be reasonable uncertainty of meaning, and the two interpretations advanced by the parties must both be reasonable. *Kiewit/Tulsa–Houston v. United States,* 25 Cl.Ct. 110, 118, *aff'd,* 981 F.2d 531 (Fed.Cir.1992); *International Business Invest., Inc. v. United States,* 17 Cl.Ct. 122, 125 (1989), *aff'd,* 895 F.2d 1421 (Fed.Cir.1990). In evaluating the reasonableness of an interpretation,

the Court should reject any interpretation which would render portions of the contract meaningless, useless, ineffective, or superfluous. *Boehm v. United States*, 22 Cl.Ct. 511, 516 (1991).

If the Court concludes that a contractual provision is ambiguous, the next step is to determine whether the ambiguity is patent. An ambiguity is patent if it was readily ascertainable at the time the contract was made and so glaring as to raise a duty to inquire on the part of the nondrafting party. *Newsom v. United States*, 230 Ct.Cl. 301, 304, 676 F.2d 647, 650 (1982). If the ambiguity is not patent, the ambiguous portion of the contract should be interpreted in a way which is more favorable to the party who did not draft the ambiguous provision, as long as that interpretation is a reasonable one. *Tibshraeny Bros. Constr., Inc. v. United States*, 6 Cl.Ct. 463, 469–70 (1984).

In the present case, this Court finds that the meaning of the contractual language at issue is ambiguous. The dual use of the terms "expeditiously" and "by the completion date" in the same sentence is needlessly confusing. Even after a careful reading of the provision, it is unclear which of the terms is controlling. It is not possible to rely on one term without rendering the other term superfluous or meaningless.

In light of the history of the Bureau's management of the reclamation project and the plaintiff's previous lack of involvement in the forms collection process, it is apparent that at the time the provision was drafted, the ambiguity was not so glaring as to give rise to a duty to inquire. At the time the provision was written, no completion date had been set by the Bureau for the return of the forms, and because of the previously enforced "no forms, no water" policy, the plaintiff had never been actively involved in the collection process. At that time, it would have been reasonable to assume that the Bureau would set a completion date sometime before the end of the 1987 irrigation season and that the "no forms, no water" policy would be reinstated for any landowners who failed to return their forms to OCID prior to that date.

This would have required little or no active involvement in form collection by OCID because, just as in prior years, landholders who wanted to continue to take project water would have had a powerful incentive to return their forms to OCID in order to remain eligible to receive water for the duration of the irrigation season.

The provision, as written, is susceptible to either of the interpretations advanced by the parties. Each of these interpretations is just as reasonable as the other. As such, the Court must construe the ambiguous language in the way that is more favorable to the plaintiff. This being the case, the Court is unable to find that the plaintiff breached this provision when it failed to return all of the forms by the completion date of May 2, 1988. All of the forms that were not returned by May 2 were returned by the latter part of June, with the exception of one form that was returned in July and another form that was returned sometime in August. Under the circumstances, the Court concludes that the plaintiff complied with the terms of the contract by returning the forms expeditiously once a completion date had been determined.

The Government also contends that OCID breached the third condition set forth in the March 24, 1987, modification by failing to make any real effort to have the forms returned later in the water year. To reiterate, this provision requires that the districts "make every effort to obtain compliance and complete the required forms later in the water year." The Government argues that the only "effort" that OCID made to have the forms returned during the remainder of the water year was to state in its June 19, 1987, letter to its landowners that the forms should be returned as soon as possible.

Although the Court is somewhat sympathetic to the Government's position, the provision must be read in the proper context. In all previous water years, the "no forms, no water" policy enabled OCID to effortlessly ensure compliance with the forms requirement. In those years, as well

as in the water years subsequent to 1987, OCID's "efforts" were limited to making the forms available and filing them upon their return. When the Bureau revoked the "no forms, no water" policy for the greater part of the 1987 water year, it removed from OCID the only surefire method of ensuring compliance with federal reclamation law. Without the "no forms, no water" policy in place, OCID had little means of assuring that the landholders/members complied with reclamation law by completing their forms. By sending the landholders the letter of June 19, 1987, OCID utilized the primary means it had to obtain compliance with reclamation law. As it turned out, many of the landholders who received this letter chose to ignore it. It is true that OCID could have sent additional reminders to its landholders throughout the remainder of the water year. However, in light of the history of OCID's limited involvement in hustling certifications in prior years, OCID's failure to aggressively pursue the nonfiling landholders in 1987 does not rise to the level of a breach of the agreement.

## III. The May 2, 1988, Deadline

 In the final analysis, the resolution of this dispute depends in a large part upon the effect of the May 2, 1988, completion date that the Bureau ultimately set for the return of the forms. To begin with, it is clear that the Secretary of the Interior, acting through the Bureau, had the power to establish a deadline for return of the required forms. In section 10 of the 1902 Reclamation Act, Congress granted to the Secretary not only the authority to promulgate rules and regulations, but also the discretion to perform acts necessary to accomplish the purposes of the Reclamation Act. 43 U.S.C. § 373 (1982). What is not clear, however, is whether the Bureau, in exercising its discretionary powers in its capacity as a contractor, acted in a fair and reasonable manner.

The plaintiff argues that the May 2, 1988, deadline is unenforceable because it violates the covenant of good faith and fair dealing.[3] In support of this argument, the plaintiff contends that the May 2 deadline served no discernible purpose and that the Bureau provided it with inadequate notice of the deadline. In addition, the plaintiff contends that the Bureau lacked the authority to penalize the districts by charging them full cost for water delivered in 1987 to landholders who failed to meet the May 2, 1988, deadline.

The Government responds that the May 2, 1988, deadline was reasonable because by the time the Bureau gave OCID the final submission deadline of May 2, 1988, OCID had known for months that the forms were due. In addition, the Government argues that timely return of the 1987 forms was essential to ensure that landowners who took water met the other eligibility requirements. Finally, the Government contends that the assessment of full cost for delivery of 1987 water to recipients who missed the May 2, 1988, deadline is not a penalty because it represents an appropriate measure of the Government's damages for OCID's breach.

 Every contract, including those in which the Government is a party, contains an implied covenant of good faith and fair dealing. *Hughes Communications Galaxy, Inc. v. United States*, 26 Cl.Ct. 123, 140 (1992); *Solar Turbines, Inc. v. United States*, 23 Cl.Ct. 142, 156 (1991). When one party has the authority to exercise discretion to determine an essential term of a contract, as here, the covenant of good faith and fair dealing requires that the exercise of that discretion be reasonable. *See, e.g., Boone v. Kerr–McGee Oil Indus.*, 217 F.2d 63, 65 (10th Cir.1954). This requires that what is done "be done honestly to effectuate the object and purpose the parties had in mind in providing

---

3. The plaintiff advances a number of other legal arguments, several of which lie outside of this Court's jurisdiction, to support its position that the May 2, 1988, deadline is unenforceable. Some of these arguments involve theories of equitable estoppel, public policy, violation of the Administrative Procedure Act, and violation of the separation of powers clause of the United States Constitution. These theories are not deserving of serious consideration, and it is unnecessary to address them to reach a just resolution in this case.

for the exercise of such power." *Id.* Moreover, although the parties to a contract are normally bound by the terms thereof, it is well settled that a contractual provision that produces an egregious, unfair, or unreasonable result will not be enforced. *Forest Envtl. Servs. Co. v. United States*, 5 Cl.Ct. 774, 777 (1984).

In this case, it is not the setting of a deadline *per se* that is unreasonable. What the Court finds troubling is the timing of the administrative decision and the manner in which the decision was conveyed to OCID. The Bureau, in its contractual capacity, had the power to enforce the forms requirement imposed by federal reclamation law at any time by setting a reasonable deadline by which the landholders were to return their forms. With this power, however, came an obligation to exercise that discretion in good faith. *Hughes*, 26 Cl.Ct. at 140.

In this case, rather than setting a completion date in the middle of the 1987 irrigation season and reinstating the "no forms, no water" policy at that time, the Bureau waited until the irrigation season had ended for most landholders before reinstating the "no forms, no water" policy. It is not surprising that the revival of the "no forms, no water" policy at the end of the 1987 irrigation season failed to have the intended effect of encouraging landholders to complete and return their forms. In the spring of 1988, however, after receiving the Solicitor's opinion that the Bureau could charge the districts full cost for water deliveries to nonfiling landholders, the Bureau promptly set a deadline for the return of the 1987 forms, and gave the districts a mere two weeks to comply. The Bureau's April 12, 1988, memorandum setting the May 2, 1988, deadline was received by OCID on April 18, 1993. Once received, OCID had to then send the notice to all of its landowners and request compliance. Under these circumstances, OCID's efforts to obtain universal compliance by all seventy-nine outstanding nonfiling landowners prior to the established deadline were almost certain to fail.

Other than providing a method for determining which landholders could be charged full cost and which could not, it is unclear just what the setting of the May 2, 1988, deadline accomplished. A sizable portion of OCID's landholders begin taking project water in the months of May or June. Thus, even without an established deadline, it was a virtual certainty that the "no forms, no water" policy already reinstated and in place would have provided sufficient incentive for nonfiling landholders who wanted 1988 water to file their 1987 and 1988 forms. This only provides further support for this Court's finding that the Bureau's decision to impose the May 2, 1988, deadline and to bill OCID full cost for 1987 water delivered to late filing landholders, coupled with the lack of notice given to OCID, was unreasonable and suggested a lack of good faith on the part of the Bureau.

■ Even if this Court were to enforce the May 2, 1988, certification set date, however, the issue of whether the Bureau had the authority to assess full cost for 1987 water would still remain. The Government maintains that the difference between the full cost rate and the subsidized contract rate represents an approximate measure of the Government's damages. OCID, on the other hand, contends that the assessment of full cost amounts to a penalty that the Government is not authorized to assess.

■ As this Court's predecessor, the United States Court of Claims, has recognized, the basic goal in awarding damages for breach of contract is to place the injured party in as good a position as it would have been had the contract been fully performed. *Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 875, 524 F.2d 707, 713 (1975), *cert. denied*, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976) (citing RESTATEMENT OF CONTRACTS § 329, comment a at 504). In contrast, a penalty is an assessment that bears no necessary relationship to the actual damages sustained by the aggrieved party. *See* BLACK'S LAW DICTIONARY 1133 (6th ed. 1990). Under the circumstances, it is difficult for this Court to view the Bureau's assessment of full

cost as anything other than a penalty. Because a handful of OCID's landholders missed the May 2, 1988, deadline, the Bureau received some of the forms later than it would have liked. Soon thereafter, however, all of the required forms were eventually completed and returned, and all late-filing landholders who received 1987 water were otherwise eligible to receive it. The purpose of the forms, which was to ascertain that all landholders who had taken water in 1987 were eligible to receive it, had been fulfilled. Economically, then, the Government is in the same position that it would have been in had all of OCID's landholders returned their forms by the established deadline of May 2, 1988. The Government's argument that the assessment is an appropriate measure of damages for plaintiff's breach is unpersuasive, given that the Government suffered no actual damages.[4]

The Government justifies its assessment of full cost on the theory that the failure of the sixteen landholders to file their 1987 forms by the May 2, 1988, deadline is a failure to comply with a congressionally mandated prerequisite to the receipt of project water. Thus, according to the Government, the district owes the Bureau full cost for the water delivered to those landholders in 1987 because the landholders' failure to meet the May 2, 1988, deadline rendered them retroactively ineligible to receive the project water that they took in 1987. This line of reasoning is superficial. Federal reclamation law does not establish a deadline for return of the certification and reporting forms. In every other year but 1987, completion and return of the forms was a prerequisite to the receipt of project water. The sole purpose for requiring the landholders to complete the forms was to provide the districts with a means of determining, prior to the delivery of water, if the landholders were eligible to receive project water. The Bureau itself waived this prerequisite in 1987 when it authorized the irrigation districts to begin delivery of project water before the 1987 forms had been finalized and distributed to the landholders. The Government cannot now come back and rely on the very statutory language that it waived in 1987 to argue that by filing their forms after the May 2, 1988, completion date, sixteen otherwise eligible landholders in OCID somehow failed to fulfill a "prerequisite" for the water they received in 1987.

 Furthermore, it is clear from the legislative history of the RRA that Congress *did not intend* for the Bureau to assess monetary penalties or fines for failure to submit the required forms. The House amendment contained just such a penalty provision, but the conference report deleted it before the bill was passed. *See* H.R.Rep. No. 97–855, 97th Cong., 2d Sess. 35 (1982). In the final regulations, issued April 13, 1987, the Bureau again rejected a proposal for assessing penalties for the taking of irrigation water in the absence of the filing of the required forms. 52 Fed.Reg. 11948 (1987). The only authorized recourse the Bureau had against landholders who received project water without filing their certification and reporting forms is found in 43 C.F.R. § 426.10(k) (1987). This provision states:

> Failure to submit the required certification or reporting form to the district will result in loss of eligibility to receive irrigation water by the individual landowner or lessee. Eligibility will be regained

---

4. In addition to its breach of contract theory, the Government also argues that its assessment of full cost was warranted under the theories of conversion and breach of an implied-in-law contract. This Court finds little merit in the Government's alternative theories of recovery for many of the same reasons set forth in the discussion above. It should be noted, however, that if it were so inclined, this Court would have jurisdiction to consider the Government's quasi-contract and tort-based claims pursuant to the authority bestowed by Congress in 28 U.S.C.

§ 1503 (1988). *See Continental Management, Inc. v. United States,* 208 Ct.Cl. 501, 506 n. 2, 527 F.2d 613, 616 (1975) (Court of Claims may consider Government's counterclaim even though it states a claim of a type (*e.g.,* tort) of which the Court would not have jurisdiction if sought to be maintained by a plaintiff); *see also BLH, Inc. v. United States,* 13 Cl.Ct. 265, 275 (1987) ("[a]lthough this court does not generally have jurisdiction over implied-in-law contracts, * * * an exception exists for counterclaims for money damages asserted by the government").

once the certification or reporting form is submitted to the district.

43 C.F.R. § 426.10(k) (1987). Thus, by the words of the Bureau's own regulation, the sixteen landholders in OCID who failed to file the required forms by the established completion date regained their eligibility once they submitted their forms to OCID later in the summer.

In view of the circumstances, this Court finds that the May 2, 1988, deadline that the Bureau set in mid-April for the return of the 1987 reporting and certification forms was unreasonable and lacking in good faith. The setting of the May 2 deadline and the accompanying penalty served no purpose other than to induce nonfiling landholders to return their 1987 forms so that their eligibility could be verified. This purpose was fulfilled, as all of the landholders in OCID ultimately filed their forms and were found to be otherwise eligible to receive project water in 1987. Under the circumstances here present, the Bureau sustained no injury and had no authority to assess a penalty.

## CONCLUSION

For all the reasons stated above, the plaintiff prevails in this action and is entitled to a refund of the amount paid, $70,-853.80 ($62,409.83 plus penalty interest of $8,443.97), to the Federal Government (Bureau), pursuant to this project water dispute. Since the plaintiff has pointed to no statute or contract provision allowing for prejudgment interest, it is entitled to no prejudgment interest. *See* 28 U.S.C. § 2516(a) (1988); *Library of Congress v. Shaw*, 478 U.S. 310, 316, 106 S.Ct. 2957, 2962, 92 L.Ed.2d 250 (1986); *Hoffman Constr. Co. v. United States*, 7 Cl.Ct. 518, 528 (1985). The clerk shall enter judgment accordingly.

Each party will bear its own costs.