FORT SUMTER TOURS,
INC., Appellant,

v.

Bruce BABBITT, Secretary of the Department of the Interior and Robert G. Stanton, Director, National Park Service, Appellees.

No. 98–5508.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 14, 2000.

Decided Feb. 15, 2000.

Peter Dickson argued the cause for appellant. With him on the briefs were Paul F. Enzinna and Jody Manier Kris.

Marina Utgoff Braswell, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: SILBERMAN, HENDERSON, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Fort Sumter Tours, Inc. (FST) provides passenger boat service to Fort Sumter National Monument in Charleston Harbor, South Carolina. The service is provided pursuant to a concession contract with the Secretary of the Interior, through the National Park Service (NPS or "Park Service"), under which FST pays the Secretary an annual franchise fee. This case involves a dispute over the fees charged during the second and third five-year periods of FST's current contract. The district court rejected FST's challenge to the

fees, as do we. We conclude that this court is without jurisdiction to consider plaintiff's attack on the fee charged during the second contractual period, because that challenge is to NPS' nonreviewable refusal to settle then pending litigation between the parties concerning that fee. We reject plaintiff's attack on the fee charged during the third contractual period because FST failed to comply with the contractual requirements for seeking reconsideration.

## I

FST's current, fifteen-year contract with the Park Service was signed in 1986 and will expire in December 2000. The contract is governed by the National Park System Concessions Policy Act, 16 U.S.C. §§ 20–20g,[1] and Chapter 24 of NPS' Concessions Guidelines, commonly referred to as NPS–48 ("NPS–48") (Joint Appendix (J.A.) at 88–135). Under the contract, FST must pay the Park Service an annual franchise fee, which is a set percentage of plaintiff's annual gross receipts. The fee is calculated to provide the concessioner with a reasonable profit, based on a comparison to rates of return in similar industries. *See* 16 U.S.C. § 20b(d); NPS–48 (J.A. at 100). In evaluating a concessioner's reported net profits, NPS may adjust reported expenses by comparing them to industry statistics. *See* NPS–48 (J.A. at 126).

FST's 1986 contract is divided into three five-year periods. During the first, the franchise fee was set at 4.25% of gross receipts. Section 9(e) of the contract provides that the fee for the second and third five-year periods may be reconsidered on either party's initiative pursuant to specified procedures. *See* J.A. at 32–33. This case involves efforts to reconsider the fee charged during each of those two periods.

## A

In June 1991, at the end of the first five-year period, the Park Service notified plaintiff that it was reconsidering the franchise fee. After an initial analysis, NPS tentatively concluded that the appropriate fee should be 12%. That conclusion was based on an examination of FST's financial reports, which persuaded the Park Service that FST had leased one of its boats from a related partnership in a deal that was "not an arm's length transaction and has resulted in lower earnings than would have occurred under an outright purchase of the boat." *See* NPS Franchise Fee Analysis ( J.A. at 74). NPS also found that FST overpaid its corporate officers relative to benchmarks for the water transportation industry. *See id.* at 73. Plaintiff objected to the proposed fee increase, and notified NPS that rather than arbitrate or negotiate the fee, "we believe it is in our mutual interest to seek a declaration of rights by the courts on this critical issue." *Fort Sumter Tours v. Babbitt ("FST I")*, No. 0918–1AJ, slip op. at 3 (D.S.C. Feb. 3, 1994) (J.A. at 138). Having received notice of FST's decision to forego arbitration and proceed to court, the Park Service notified FST that it had made a final decision to raise the fee to 12%.

On April 21, 1993, FST filed suit in the United States District Court for the District of South Carolina, charging, inter alia, that: (1) NPS lacked contractual or statutory authority to increase the franchise fee; (2) the increase violated the Administrative Procedure Act (APA), 5 U.S.C. § 706, because NPS acted arbitrarily and capriciously in employing the procedures it used to raise the fee; and (3) imposition of a 12% fee violated the APA because it was unjustified "by substantial evidence regarding the profits earned by FST." *FST I*, slip op. at 4, 14 (J.A. at 139, 149). The South Carolina District Court rejected all of plaintiff's claims, finding the agency's

---

1. In 1998, the Concessions Policy Act was replaced by the National Park Service Concessions Management Improvement Act, 16 U.S.C. § 5951 *et seq.* The new legislation does not affect the issues in this case.

procedures authorized and rational, and holding that the 12% fee was "not so excessive as to preclude a reasonable opportunity for [plaintiff] to earn a profit from its concession." *Id.* at 11–21 (J.A. at 146–56). Plaintiff appealed to the United States Court of Appeals for the Fourth Circuit, which, after de novo review, upheld the district court's decision. The Court of Appeals rejected FST's contractual and APA challenges to the franchise fee, finding that "NPS had both the statutory and the contractual authority to raise FST's franchise fee.... [and that] the fee determination itself [was] unobjectionable." *Fort Sumter Tours, Inc. v. Babbitt* ("*FST II*"), 66 F.3d 1324, 1337 (4th Cir. 1995). On February 22, 1996, plaintiff petitioned the Supreme Court for a writ of certiorari.

During the week of March 10, 1996, while the petition for certiorari was pending, FST's president, George Campsen, Jr., approached NPS' Concessions Program Manager, Robert Yearout, at a trade association meeting. Campsen asked Yearout whether he was willing to discuss the franchise fee. Although the parties dispute the contents of the ensuing conversation,[2] shortly after the meeting Campsen wrote Yearout a letter. In it, Campsen noted that "the litigation was ongoing" and that the "judicial process" was "time consuming and expensive," and he suggested that it was "of mutual interest that NPS and FST make a good faith attempt to resolve this matter." J.A. at 177–78. Campsen also expressed his appreciation for Yearout's "willingness to explore the

opportunity for some 'common ground' resolution." *Id.* at 177.

On May 10, 1996, Campsen and his son met with three government officials: Yearout, an Interior Department attorney, and a financial analyst for the Park Service. The parties again dispute the contents of their conversation.[3] Five days after the meeting, the Interior Department attorney sent Campsen a letter, thanking him for the opportunity to meet, and concluding that "[b]ecause of the continuing litigation ... , any further correspondence on this matter will come from John Douglas, Assistant U.S. Attorney." *Id.* at 187.

On May 28, 1996, the Supreme Court denied the petition for certiorari. *See Fort Sumter Tours, Inc. v. Babbitt,* 517 U.S. 1220, 116 S.Ct. 1848, 134 L.Ed.2d 949 (1996). In early June, the NPS financial analyst traveled to South Carolina to meet with FST officials. On July 1, 1996, shortly after the expiration of the 25–day period for filing a petition for rehearing of the denial of certiorari, Assistant U.S. Attorney Douglas sent FST's counsel a letter advising plaintiff that "we have concluded that settlement would not be in the interests of the United States." J.A. at 198.

## B

While the litigation regarding the second contractual period was winding to a close, so too was the second period itself. Under section 9(e) of FST's concession contract, a party must request reconsideration in writing within sixty days of the end of a five-year period. If no adjustment has been agreed to within 120 days

---

**2.** Yearout contends he informed Campsen that, because the matter was still in litigation, he could not make any commitments without the approval of the Department of Justice. *See* Yearout Decl. ¶ 6 (J.A. at 174–75). Campsen says Yearout merely told him he would be happy to look at any information Campsen wanted to present. *See* Campsen Responsive Decl. ¶ 5 (J.A. at 210).

**3.** NPS contends that agency counsel stated at the outset that the purpose of the meeting was to "receive from FST information to be con-

sidered by NPS for the purpose of possibly recommending to the Department of Justice whether the Justice Department should engage in settlement discussions regarding FST's pending lawsuit." Hanslin Decl. ¶ 5 (J.A. at 181). NPS also contends that Campsen "stated that he understood and agreed as to this purpose." *Id.* ¶ 6 (J.A. at 181). Campsen remembers no such statement by agency counsel and denies making the statement attributed to him. *See* Campsen Responsive Decl. ¶¶ 15, 16 (J.A. at 211–12).

thereafter, the concessioner is required to reduce its position to writing within thirty days and submit it to the Secretary for a determination of appropriate fees. *See* J.A. at 32.

On June 14, 1996, the day after the second period ended, plaintiff wrote John Tucker, the superintendent of Fort Sumter National Monument, requesting that, for the third period, the 12% fee be reduced to the original 4.25%. *See id.* at 205. On August 1, Tucker wrote back:

> [W]e would be pleased to meet with you to discuss your proposal in relation to the probable value of the contract. We would propose a meeting in late September at which our respective positions would be discussed.... I will get back to you in a few weeks to discuss a meeting date.

*Id.* at 207. No further correspondence ensued, and no meeting was held.

### C

While the parties disputed the second- and third-period franchise fees, FST refused to pay the increase and continued to remit payments at the 4.25% rate. Between June 1993 and June 1996, NPS sent FST five letters demanding payment of past due amounts. *See id.* at 190–97. In December of 1996, NPS presented FST with a debt compromise proposal for the approximately $1 million in back fees, interest, and penalties still due. FST counter offered. *See id.* at 200. On January 21, 1997, NPS rejected the counteroffer and notified FST that if payment were not made by February 28, 1997, NPS would terminate the contract. *See id.* at 203.

Plaintiff responded by filing the present lawsuit, which challenged the Park Service's refusal to reduce the franchise fee for the second and third contractual periods. At an early hearing in the case, NPS advised the district court that a final decision had not yet been reached regarding the third-period fee, but that such a decision would be forthcoming. That decision was made on March 31, 1997. NPS noti-

fied plaintiff that the 12% fee would remain in effect because FST had failed to reduce its final position to writing and submit it to the Secretary by the date specified in the contract. Referring to section 9(e) of the contract, NPS' notification letter stated:

> As we did not come to agreement upon an adjustment of the franchise fee by October 12, 1996, 120 days after June 14, 1996, you had 30 days from that date, to November 11, 1996, to reduce your position to writing and to submit it to the Secretary for a determination of an appropriate fee for the period commencing June 14, 1996. This you did not do. Likewise, you did not request that advisory arbitration be initiated in connection with your request for reconsideration of the contract's 12% franchise fee.

J.A. at 311–12.

Although Plaintiff's complaint raised multiple claims, only two sets remain at issue on this appeal. In the first, FST contended that the Park Service violated the APA by arbitrarily and capriciously refusing—in July 1996—to reduce the second-period fee as requested by plaintiff. Granting summary judgment for defendants, the district court did not reach the merits of this claim, but instead held that NPS' refusal was judicially nonreviewable because it represented nothing more than a refusal to settle the then-pending South Carolina litigation. *See Fort Sumter Tours, Inc. v. Babbitt* (*"FST III"*), No. 97cv00293, slip op. at 12–16 (D.D.C. Aug. 28, 1998) (J.A. at 312–16). Plaintiff's second contention was that NPS breached the concession contract, and acted arbitrarily and capriciously, by refusing to reconsider the fee for the third period. The court granted summary judgment for defendants on that contention as well, holding that plaintiff had failed to submit its request for reconsideration in accordance with the procedures outlined in section 9(e) of the

contract. *See id.* at 16–18 (J.A. at 316–18). This appeal followed.[4]

## II

▮ We begin with the dispute over the second-period fee. Because the district court decided the issue on summary judgment, our standard of review is de novo. *See Hunter–Boykin v. George Washington University*, 132 F.3d 77, 79 (D.C.Cir.1998); *see also Grant v. United States Air Force*, 197 F.3d 539, 541 (D.C.Cir.1999). The question before us, however, is quite narrow. Needless to say, we have no authority to review the decision of the Fourth Circuit, which upheld the merits of NPS' initial decision to raise the franchise fee. Plaintiff contends, however, that we may review NPS' July 1996 refusal to reconsider and lower the fee. The question before us, then, is whether NPS' refusal is subject to judicial review.

▮ An agency's refusal to reconsider a prior decision is only reviewable under limited circumstances. *See ICC v. Brotherhood of Locomotive Engineers (BLE)*, 482 U.S. 270, 278–81, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987); *Sendra Corp. v. Magaw*, 111 F.3d 162, 166–67 (D.C.Cir.1997). It is true that "[i]f for any reason the agency reopens a matter, and after reconsideration, issues a new and final order, that order is reviewable on its merits." *Sendra* 111 F.3d at 167; *see BLE*, 482 U.S. at 278, 107 S.Ct. 2360. Plaintiff contends that NPS did reopen the fee issue in 1996. NPS, by contrast, contends that it merely evaluated the issue for purposes of deciding whether to settle plaintiff's South Carolina lawsuit, and that the July 1996 letter from Assistant U.S. Attorney Douglas represented a decision not to do so. FST

does not dispute that the Justice Department has sole authority to settle lawsuits on behalf of the United States, *see* 28 U.S.C. §§ 516, 519, and that a decision whether to settle a case like FST's—if that is what occurred here—would not be reviewable under the APA, *see* Oral Arg. Tr. at 5. *Cf. New York State Dep't of Law v. FCC*, 984 F.2d 1209, 1213–15 (D.C.Cir. 1993) (holding nonreviewable FCC decision to settle enforcement action); *Schering Corp. v. Heckler*, 779 F.2d 683, 685–87 (D.C.Cir.1985) (holding nonreviewable FDA decision to settle and dismiss enforcement action).[5]

We agree with the district court that the July 1996 letter represented a decision not to settle the litigation between the parties. The government's initial written response to plaintiff's overtures, sent by Interior Department attorney Lars Hanslin in May of 1996, made clear that the government was undertaking to review the matter in connection with the then pending litigation. Hanslin advised FST that the Park Service's consideration would be made "in consultation with appropriate officials of the Department of Justice." J.A. at 187. And he emphasized that

> *Because of continuing litigation* between Fort Sumter Tours and the National Park Service, any further correspondence on this matter will come from John Douglas, Assistant United States Attorney. As I am sure you appreciate, the National Park Service, *because of the litigation* is not in a position to directly respond to the concerns you have raised.

*Id.* (emphasis added).

The government's final decision letter, dated July 1, 1996, makes the character of

---

**4.** Plaintiff's other claims challenged various NPS actions in connection with the concession contract, on grounds ranging from breach of contract to violation of the APA. The district court dismissed those claims pursuant to Fed.R.Civ.P. 12(b)(6), in some instances because they were barred by the Fourth Circuit's decision in *FST II. See FST III*, slip op. at 19, 22 (J.A. at 319, 322). Plaintiff has not appealed from the dismissal

of any claims other than those discussed in the text.

**5.** Although there may be circumstances in which a substantive statute places limits on an agency's settlement discretion, *see New York State Dep't of Law*, 984 F.2d at 1215, no such argument has been advanced concerning the Justice Department's litigation authority here.

its determination even more manifest. That letter, which is set out in relevant part in the margin,[6] was sent not by the agency, but by its Justice Department counsel. It was sent not to FST itself, but to its attorneys. Its subject-reference line indicated that the topic was FST's lawsuit. The letter recited that the Park Service had reviewed the franchise fees "with a view toward potential *settlement.*" *Id.* at 198 (emphasis added). And it informed plaintiff's counsel that: "[W]e have concluded that *settlement* would not be in the best interests of the United States." *Id.* (emphasis added).

Notwithstanding the express language of the July 1996 letter, plaintiff contends that it represents the denial of a reopened administrative decision, rather than the rejection of a settlement. FST proffers three related arguments. First, it argues that the letter cannot represent a decision regarding settlement because the South Carolina litigation had effectively ended by the time FST made the March 1996 overture to which the letter responded. All that remained pending at that time was the petition for certiorari, which, FST suggested at oral argument, was not "cert. worthy." Oral Arg. Tr. at 11.

FST's argument is unpersuasive. While we raise our eyebrows at plaintiff's admission that it filed a certiorari petition know-ing it was unworthy of Supreme Court review,[7] the fact remains that that petition was pending at the time FST's president approached NPS' Concessions Program Manager for reconsideration. Indeed, FST's March 15, 1996 letter expressly noted that "the litigation is ongoing because ... [FST] has petitioned the U.S. Supreme Court in the hopes of judicially correcting what we perceive as a grave injustice." J.A. at 177. Moreover, also pending at that time—and still pending after the petition was denied—were NPS' efforts to collect nearly a million dollars in unpaid fees, interest, and penalties. As plaintiff itself later suggested, those, too, were potentially part of a global settlement between the parties. *See id.* at 201 (Dec. 31, 1996 letter from FST, proposing to pay fees in arrearage at 5% and third-period fees at 6%). Although plaintiff's self-assessment of its weak litigating position turned out to be correct, that merely confirms the wisdom of the government's ultimate decision not to settle; it does not establish that the government never assessed the situation on its own.

Second, plaintiff contends that the July 1996 letter reflects an administrative reopening, rather than the rejection of a settlement, because it recites that the Park Service engaged in a "thorough review" of

---

**6.** Marvin D. Infinger, Esq.
　Sinkler & Boyd, P.A.

　. . . .

　RE:　Fort Sumter Tours, Inc. v. Bruce Babbitt
　C/A No. 2:93–0918–1, District of South Carolina
　No. 94–1570, Fourth Circuit Court of Appeals
　No. 95–1353, Supreme Court
　Dear Marvin:
　As you no doubt know, the responsible officials at the Park Service have recently engaged in a thorough review of the franchise fees that were at issue in the above litigation, at the instigation of your client, *with a view toward potential settlement.* This review was undertaken with the full agreement and cooperation of the Justice Department. After due consideration of both the merits of your client's contentions and the procedural posture of the case, *we have concluded that settlement would not be in the interests of the United States.* I would emphasize that this decision was based both upon the review of the apparent fairness of the franchise fees imposed and the fact that the Supreme Court has denied the writ of certiorari which you had sought. This concludes my handling of this case and I am closing my file on it at this time.
　. . . .
　Sincerely yours,
　. . . .
　John H. Douglas
　Assistant U.S. Attorney
J.A. at 198–99 (emphasis added)

**7.** *See* Oral Arg. Tr. at 11 ("This was not a cert. worthy case. Anybody could have looked at it and decided that.").

the franchise fees, considered "the merits" of FST's contentions, and made its decision based in part on a "review of the apparent fairness of the franchise fees imposed." J.A. at 188–89. According to FST, these are indicators of a true agency reconsideration, not merely of a decision whether to settle a lawsuit.

■ Once again, we find plaintiff's argument unpersuasive. The fact that the agency considered the merits of plaintiff's position can hardly serve to remove its decisionmaking from the realm of settlement. Indeed, it would be extraordinary for the government to make a settlement decision without considering the merits of the underlying dispute. And as we have said more generally with respect to determining whether an agency has truly reopened a prior decision: "That the agency discusses the merits at length when it denies a request for reconsideration does not necessarily mean the agency has reopened the proceedings.... It would make no sense whatsoever to hold that when an agency offers an explanation for 'affirming a prior denial,' it has in effect reopened the proceedings and rendered a new, judicially-reviewable decision." *Sendra,* 111 F.3d at 167 (quoting *BLE,* 482 U.S. at 281, 107 S.Ct. 2360). The Supreme Court has made precisely the same point:

> It is irrelevant that the commission's order refusing reconsideration discussed the merits of the unions' claim at length.... [O]ne cannot intelligently rule upon a petition to reconsider without reflecting among other things, whether clear error was shown. It would hardly be sensible to say that the Commission can genuinely deny reconsideration only when it gives the matter no thought; nor to say that the character of its action (as grant or denial) depends upon whether it chooses to disclose its reasoning. Rather, it is the Commission's formal action, rather than its discussion, that is dispositive.

*BLE,* 482 U.S. at 280–81, 107 S.Ct. 2360

■ But, plaintiff continues, surely the inclusion of language indicating the agency undertook a "thorough review" at least renders the letter ambiguous. And, that being so, was not summary judgment inappropriate, since on summary judgment uncertainties are to be resolved in the nonmoving party's favor? *See* FST Br. at 26 (citing *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). The answer is: not these kinds of uncertainties. For the reasons just stated, the "thorough review" language does not render the letter ambiguous. But even if it did, ambiguity as to whether the agency had reopened its decisionmaking would not advance appellant's cause. To the contrary:

> Only "when the agency has *clearly* stated or otherwise demonstrated" that it has reopened the proceeding will the resulting agency decision be considered a new final order subject to judicial review under the usual standards.... [U]nless the agency *clearly* states or indicates that it has reopened the matter, its refusal of a request for reconsideration will be treated as simply that.

*Sendra,* 111 F.3d at 167 (quoting *Morris v. Sullivan,* 897 F.2d 553, 558 (D.C.Cir.1990)) (citations omitted) (emphasis added). Not even plaintiff contends that NPS "clearly" stated it had reopened the matter.

Finally, plaintiff argues that it was error for the district court to conclude that NPS' decision was a nonreviewable settlement determination without first demanding that the agency produce the full administrative record of the 1996 decision. Summary judgment was inappropriate, FST contends, because there are factual disputes over what happened at several meetings between the parties, *see supra* notes 2 & 3, and because NPS did not characterize its decision as one involving settlement "until this suit was filed and then only in the [form of] *post hoc* affidavits." FST Br. at 26.

■ We reject this argument as well. As the district court held, while there may

be factual disputes in this case, they are not material to resolution of the issue at hand. Here we have a formal decision document: the July 1, 1996 letter from Assistant U.S. Attorney Douglas. That document is not "post hoc." To the contrary, because it was a contemporaneous communication of the agency's final determination, it is as "hoc" as a document can be. The decision expressly communicated on the face of that document is: "[W]e have concluded that *settlement* would not be in the interests of the United States." J.A. at 198 (emphasis added). In such circumstances, both this court and the Supreme Court have held that we should look no further. "Courts will not," we said in *Sendra Corp. v. Magaw,* "look behind the agency's formal disposition of the reconsideration request to see whether the agency 'in fact' reopened its original decision (and thus rendered a new final order)." *Sendra,* 111 F.3d at 167. "Where the [agency's] formal disposition is to deny reconsideration, and where it makes no alteration in the underlying order, we will not undertake an inquiry into whether reconsideration 'in fact' occurred." *BLE,* 482 U.S. at 280–81, 107 S.Ct. 2360.

■ In sum, we agree with the district court that the July 1996 decision was a nonreviewable settlement determination. This Circuit has recently held that the nonreviewability of a similar kind of agency decision is not simply a question of deference to agency discretion, but of the absence of jurisdiction. *See Entravision Holdings, LLC v. FCC,* 202 F.3d 311, 313 & n.* (D.C.Cir.2000) (denial of reconsideration); *see also BLE,* 482 U.S. at 282, 287, 107 S.Ct. 2360. Accordingly, we must vacate the judgment with respect to the claims regarding the second contractual period, and remand with instructions to dismiss those claims for lack of jurisdiction.

## III

■ In its remaining set of claims, plaintiff contends that NPS' refusal to re-

consider the franchise fee for the third five-year period breached the concession contract and was arbitrary and capricious. NPS refused to reconsider on the ground that, as it read the contract, FST had failed to comply with a requirement that it submit a second written statement of its position after 120 days had passed without agreement. The district court found that the language of the contract unambiguously supported NPS' interpretation. *See FST III,* slip op. at 17 (J.A. at 317). Because the ambiguity of a contract is a question of law, our review is de novo. *See Bennett Enters., Inc. v. Domino's Pizza, Inc.,* 45 F.3d 493, 497 (D.C.Cir.1995); *LTV Corp. v. Gulf States Steel, Inc.,* 969 F.2d 1050, 1055 (D.C.Cir.1992).

■ Like the district court, we believe the contract is clear and that the government was entitled to enforce it according to its terms. Section 9(e) states:

> Within sixty (60) days after the end of each 5–year period of this contract or as otherwise specified, at the instance of either party hereto, the amount and character of the franchise fees provided for in this section may be reconsidered. *Such request shall be made in writing within 60 days after the end of the applicable contract year* but cannot be made before the end of such year. In the event that the Secretary and the Concessioner cannot agree upon an adjustment of the franchise fees *within 120 days from the date of the request for renegotiation as made by either party, the position of the Concessioner must be reduced to writing within 30 days* therefrom and submitted to the Secretary for a determination of appropriate fees . . . .

J.A. at 32 (emphasis added). Thus, the contract requires that if the parties cannot agree within 120 days from the date of the original written request, the concessioner must again reduce its position to writing within another thirty days and submit it to the Secretary. It is conceded that no writ-

ing was submitted after the passage of the 120–day period.

■ Plaintiff contends that its original request for a 4.25% fee for the third period—submitted in its June 14, 1996 letter—should be sufficient to satisfy the requirement of a writing. As the district court noted, however, the contract plainly "includes reference to two separate writings: a written request initiating the reconsideration process, and a written summary of the concessioner's position to be submitted sometime after 120 days, but no more than 150 days after the original request, assuming the parties do not resolve the issue earlier." *FST III*, slip op. at 17 (J.A. at 317). At bottom, FST asks us to read the latter provision out of the contract—a suggestion that is inconsistent with our general approach to contract interpretation. *See United States v. Insurance Co. of N. Am.*, 83 F.3d 1507, 1511 (D.C.Cir.1996) (noting the "cardinal principle of contract construction: that a document should be read to give effect to all its provisions") (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)); *see also YRT Servs. Corp. v. United States*, 28 Fed.Cl. 366, 389 (1993) ("When interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless.").

■ Nor is the provision at issue unimportant to the contract. Section 9(e) channels fee disputes through a series of resolution points short of litigation. The second writing requirement compels the concessioner to reconsider its own position and make a final offer, while at the same time ensuring that the Secretary will have a last clear chance to negotiate a settlement. FST chose to ignore that contractual requirement and resort directly to the courts (for a second time). Like the district court, we find the contract unambiguous and plaintiff's failure to abide by its terms fatal to its cause.[8] Nor do we find anything in the government's behavior inconsistent with its duty to act in good faith when enforcing its rights under a contract. *See Solar Turbines, Inc. v. United States*, 23 Cl.Ct. 142, 156–57 (1991).[9]

**IV**

For the forgoing reasons, we reject plaintiff's challenges to the franchise fees the Park Service established for the second and third periods of the concession contract. The judgment with respect to the second contractual period is vacated and remanded with instructions to dismiss those claims for lack of jurisdiction. In all other respects the judgment below is affirmed.

---

8. The district court further concluded that because NPS did not reconsider the third-period fee, "there was no 'final agency action' subject to review under the APA." *FST III*, slip op. at 18 (J.A. at 318). The government does not press this point on appeal, *see* NPS Br. at 24, and we conclude that NPS' third-period decision is reviewable. Notwithstanding the contract's use of the term "reconsideration" to describe the process for adjusting fees, the contract essentially grants the concessioner the right to a new agency decisionmaking for each five-year period, provided it follows the requisite procedures. *See* J.A. at 32–33; *see also* 16 U.S.C. § 20b(d). NPS' decision is therefore reviewable, although FTS' appeal fails on the merits because plaintiff did not follow those procedures.

9. This is not a case like *Orange Cove Irrigation District v. United States*, 28 Fed.Cl. 790 (1993), cited by plaintiff, in which the Court of Federal Claims held the government to have breached its covenant of good faith and fair dealing by insisting on adherence to an unreasonable deadline. There, the two-week deadline imposed by the government was not contained in the contract, was imposed without notice to the contracting party, and was so short as to make it "almost certain" that compliance would be impossible. *Id.* at 801. Moreover, the contracting party did comply "soon" after the deadline. *See id.* at 802. The situation here is different in every respect.